CHARLES H. JONES, as Trustee under a Trust Agreement, on Behalf of Himself and All Other Holders of Common Stock of Adams Express Company Similarly Situated, Plaintiff, v. GEORGE P. HEALY, as Treasurer of Adams Express Company, a Joint-Stock Association, et al., Defendants.

WILLIAM L. DEMUTH et al., on Behalf of Themselves and All Other Stockholders of Adams Express Company Similarly Situated, Plaintiffs, v. GEORGE M. GILLIES, JR., as President of Adams Express Company, et al., Defendants.

WILLIAM G. RABE et al., Plaintiffs, v. GEORGE P. HEALY, as Treasurer of Adams Express Company, a Joint-Stock Association, Defendant.

C. SEDWICK LEVY et al., Plaintiffs, v. GEORGE M. GILLIES, JR., as President of Adams Express Company, a Domestic Joint-Stock Association, Defendant.

Supreme Court, Special Term, New York County, May 1, 1945.

*Whitney N. Seymour* and *Richard B. Persinger* for Charles H. Jones, plaintiff.

*Harold L. Fierman* and *Milton Kunen* for William L. Demuth and another, plaintiffs.

*Gerard I. Walters* for William G. Rabe and others, plaintiffs.

*J. Norman Lewis* for C. Sedwick Levy and another, plaintiffs.

*Alfred A. Cook, William M. Parke, Ben Herzberg, Leonard P. Moore* and *George T. Clark* for defendants.

PECK, J. This is an action by shareholders of the Adams Express Company, a joint-stock association, to set aside an appraisal of their stock, made in June, 1944, upon their dis-

senting from an amendment to the articles of association extending the life of the company from July 1, 1948, to July 1, 1998.

The articles of association provide that shareholders dissenting from any amendment shall be entitled to receive the " true cash value " of their shares at that time, as assessed by the president, secretary and treasurer of the company. These officers made an appraisal of the value of the shares as of June 6, 1944, the date of the amendment and plaintiffs' dissent, and found the value to be $13.30 a share, as against a market value as of that date of $12.25, a net asset value as calculated by the company of $17.41 a share, a liquidating value as calculated by the company of $15.69 a share, and a net asset value of $18.52 and a liquidating value of $17.59 a share as calculated by the plaintiffs.[1]

The question is whether the appraisers erred, as a matter of law, in the theory or basis upon which they made the appraisal or in the factors which they considered or failed to consider in reaching their conclusion.

The formal appraisal arrives at " true cash value " by weighting the following figures:

(1) A figure resulting from discounting net asset value ($17.41) by the percentage (31%) by which Adams stock in the market had sold under asset value during the preceding five months. The resulting figure was $12.01 a share and was given a weight of 5.

(2) A figure resulting from discounting the net asset value of Adams stock as of March 31, 1944 ($16.53), by the percentage (23.6%) by which the shares of representative closed-end investment companies (15) sold on June 6, 1944, under their latest published net asset value, i.e., as of March 31, 1944. The resulting figure was $12.63 and was given a weight of 10.

(3) A figure resulting from capitalizing the 1943 dividend paid by Adams to produce the average yield on June 6, 1944, share prices of the 1943 dividends of investment companies paying a comparable dividend. The resulting figure was $12.69 and was given a weight of 10.

(4) Mean market price of Adams stock on June 6, 1944 (12⅛), given a weight of 10.

---

[1] The company has for some years been a closed-end investment trust. The difference in the parties' calculation of asset value is that the company took its underlying securities at their market value and the plaintiffs added something for the fact that the securities included large blocks of two stocks. The difference in liquidating value is due to the same consideration and different estimates as to the prices that might be realized on liquidation.

(5) A figure (meant to relate Adams stock to the market performance of closed-end investment shares generally) resulting from adding to the market price of Adams stock seven months before ($10.75) the increment (10.7%) in market value of the shares of representative investment companies (15) during the seven months preceding June 7, 1944. The resulting figure was $11.90 and was given a weight of 7.

(6) A figure resulting from a calculation identical to (5) but employing the percentage of market increment (13.85%) found for nine leverage investment companies for the same period. The resulting figure was $12.24 and was given a weight of 10.

The resulting weighted average of all these factors was $12.31 a share for Adams stock, to which the appraisers added $1 (ninety-nine cents) for " intangible elements incapable of scientific valuation ", reaching a " true cash value " of $13.30.

Plaintiffs' attack upon this appraisal is twofold. First, the plaintiffs contend that Adams, as a joint-stock association, is essentially a partnership; therefore, as a matter of law, dissenting stockholders are entitled to a valuation of their shares on the same basis as a retiring partner would be entitled to a valuation of his interest in a partnership on liquidation; hence plaintiffs were entitled to the net value or liquidating value of their prorata interest in the assets of the company.

Second, plaintiffs contend that even if their concept of Adams as a partnership and of the dissenting shareholders as retiring partners is rejected, and the shares were to be valued on the same basis as the shares of a corporation in like event, the appraisal was still manifestly erroneous because the calculations made by the appraisers reflected only market value, with an arbitrary addition of $1 a share, and did not take account of many other relevant factors.

The defendants contend that a joint-stock association like Adams is more akin to a corporation than a partnership and that the shares of dissenting stockholders should be valued on the same basis as shares of a corporation. The defendants further contend that the appraisal was a sound and scientific valuation of the shares, taking into consideration all relevant factors, and that the allowance of $1 over and above the resulting figure was a sufficient allowance for any factors which might have been considered but were not considered.

The court will follow the parties' approach to this matter, and first consider the nature of a shareholder's interest in the company and the basis upon which dissenting shares should be valued, and then consider whether the appraisal sufficiently

reflects all of the considerations which should have entered into the appraisal.

So much has been written in the decisions and texts on the nature of joint-stock associations that any review of the literature would be exhausting. The legal dissection and analysis of these associations for their kinship to corporations and partnerships has produced varying reactions as to whether the relationship is closer to the one or the other. It can be said in summary, however, that while the older cases, involving and emphasizing the individual liability of the shareholders, drew the analogy closer to a partnership, the later cases, involving and emphasizing other aspects of the association, have drawn the analogy closer to a corporation. It can also be said that as these associations have grown larger and stronger, the incident of the personal liability of shareholders has lessened in importance and the corporate qualities of the associations have assumed greater importance.

In order to give a review of the decisions which will adequately reflect the law on the subject and not be overly discursive, this opinion will refer only to the New York cases which may be regarded as milestones in the law of joint-stock associations and particularly pertinent to the case at hand.

*Wells* v. *Gates* (18 Barb. 554, 556–557 [1854]) is a typical case holding the members of a joint-stock association personally liable for the indebtedness of the association, the court saying: '' Calling themselves stockholders, and their firm an association, and the number of the members being considerable, cannot make the slightest difference in this respect. In this state, personal responsibility, to the full extent of the indebtedness to third parties, can only be avoided by the persons constituting any association, when they become a corporation, or a *quasi* corporation. Companies, or societies, which are not sanctioned expressly by the legislature, pursuant to some general or special law, are nothing more than ordinary partnerships; and the laws respecting them are the same.''

In *Waterbury* v. *Merchants' Union Express Company* (50 Barb. 157, 161 [1867]) the court had under consideration the relationship between a shareholder and a joint-stock association, as raised by the application of a shareholder for the dissolution of the company and appointment of a receiver. The court said: '' What, then, are the true relations of a shareholder in one of these associations, and by what rules and analogies are his rights to be determined where he seeks a controversy with the body to which he belongs. These institutions are of

such recent origin among us, and have arisen under laws of such recent enactment, that we are without judicial precedents in this country. It seems to me, however, plain that in controversies like the present one, we must follow mainly the analogies afforded by laws and jurisprudence in the case of corporations, instead of those derived from the law of simple partnership.''

The court then proceeded to give an analysis of the relationship between shareholder and association which is as revealing as anything written on the subject. After referring to the element of individual liability, the court said (pp. 161–162): '' Be this as it may, it is nevertheless true, that the situation and relations of a shareholder in one of these associations, are in other respects like, and very exactly like, those of a stockholder in a corporation. His interest is represented by a certificate of stock, which he can sell and transfer by a single indorsement.. He has confided the management to a board of trustees, or some other authority named in the articles signed by himself, and the same articles prescribe the duration of the company. He has no right of management or control, except that which he exercises originally or periodically in the choice of the managers, and even then his right is not, as in the case of a partnership, equal to that of every other partner, but is equal only to the amount of stock which he owns. He is bound by the compact which holds the association together and is the law of its existence, as the charter is the law of a corporation.

'' Guided by these relations, and by the nature of these companies, which have the express sanction of our laws, I am of opinion that the rules which govern simple common law partnerships afford but a feeble analogy, if any at all, to govern us in the controversy which the plaintiff has instituted with the association to which he belongs * * * .''

The court in *McVicker* v. *Ross* (55 Barb. 247, 248 [1869]) held that a dissenting shareholder in a joint-stock company was entitled to have the valuation of his interest actually ascertained by a sale in the only manner recognized by law for closing up partnerships '' in the absence of express stipulation ''.

In *People ex rel. Pratt* v. *Wemple* (117 N. Y. 136, 144 [1889]) the court, in holding a joint-stock association liable for a franchise tax, spoke of an association similar to the defendant, as follows: '' It seems obvious, from these articles, that the arrangement consummated by them has little in common with a private partnership, for they provide for a permanent investment of capital, the right of succession, the transfer of property

by an assignment of the certificate of ownership, and the prosecution of suits in the name of one person. The company has, therefore, the characteristics of a corporation, and, so far as it can, it assumes to itself an independent personalty, and asserts powers and claims privileges not possessed by individuals or partnerships."

The court concluded that it could find nothing to warrant the contention of the company that it was a mere partnership, to be treated only as such.

In *People ex rel. Winchester* v. *Coleman et al.* (133 N. Y. 279 [1892]) the court, in holding that a joint-stock association was not taxable upon its capital under a statute relating to " corporations ", drew the distinction between joint-stock associations and corporations as wide as it has been drawn in any New York decision, observing that when the company there involved was formed in 1853 the law recognized a substantial distinction between joint-stock companies and corporations and never confused the one with the other. The court also observed that subsequent enactments showed that the legislative intent was still to preserve and not to destroy the original difference between the two classes of organizations. Nevertheless, the court referred (p. 283) to the earlier decision of *People ex rel. Pratt* v. *Wemple* (*supra*) as showing " * * * very forcibly how almost the full measure of corporate attributes has, by legislative enactment, been bestowed upon joint-stock associations until the difference, if there be one, is obscure, elusive and difficult to see and describe."

In *Matter of Jones* (172 N. Y. 575, 582 [1902]) the court had under consideration the nature of a joint-stock association and of the interest of a shareholder therein by reason of the assertion by the executors of Jones that his shares should not be taxed as personal property but should be treated as realty because the assets of the company behind the stock were realty. In rejecting this contention and in distinguishing between the nature of the stock in such an association and the nature of the assets of the association, the court said: " As to the nature of the shares of stock issued by a joint stock association, the same general principles of law are to be invoked that apply to a corporation."

Finally, in *Hibbs* v. *Brown* (190 N. Y. 167, 180–181 [1907]) the court, holding that bonds of the Adams Express Company were negotiable instruments, although not backed by the credit of the individual members of the association, said: " Now while it is true that these statutes conferring upon joint stock associa-

tions the attributes of corporations, and the opinions discussing the similitude of the former to the latter do not destroy the element of individual liability, they do irresistibly force upon us appreciation of the fact that a great association like the Adams Express Company is very unlike an ordinary copartnership and that it has assumed for ordinary, practical purposes in its business and contractual relations, the features and characteristics of a corporate creation, whereby the joint aggregate entity has been made prominent, and the individual units composing it have been overshadowed and obscured. * * * In short, I do not think that we should transgress any proper limits, if we assume that the public in dealing with the present bonds did so solely upon the faith and credit of the association, the entity which issued them, and without knowledge or thought of the individuals who composed it or their financial responsibility.''

Similarly, it may be said with equal confidence that the members of the public who have become shareholders in this company during this century have done so with little, if any, knowledge or thought of the individuals who composed it or their financial responsibility. The company has long since ceased to be an express company or operating company and has for years been nothing more than a closed-end investment trust. The personal identity and liability of the twelve thousand shareholders and any other incidents of the partnership relation have thus been effectively obliterated.

While the plaintiffs argue with much force that the nature of the relationship between the shareholders and the association should be judged in the light of 1854, when the association was organized, and that the articles should be given exactly the same interpretation today as they would have been given in 1854, the court does not feel confined by that historic view of the articles or of the shareholders' relationship to the association.[2] The court sees no reason for disregarding the fact that the present shareholders, including the plaintiffs, became shareholders during the past fifteen years, when the understanding of the nature of a joint-stock association, and this one in particular, has been more precise than it may have been ninety

---

[2] The plaintiffs placed in evidence numerous reports of the association referring to itself as a copartnership and to the shareholders as partners. Other reports described the association as a joint-stock association or as being organized under the common law of contract. Adams and similar associations have vacillated and straddled on their legal position as has suited their purpose from time to time. As interesting as this legal history is, the court does not find it indicative of the basis for valuing the shares of the company.

years ago, and when the conception of the association as expressed in *Hibbs* v. *Brown* (190 N. Y. 167, *supra*) has been current.

The court cannot accept the view of the plaintiffs that this company should be treated as an ordinary partnership and the shareholders as ordinary partners, with the consequence that their shares should be appraised simply as a prorata interest in the assets of the association on liquidation.

There are three reasons, apart from any determination of the nature of a joint-stock association, why the court cannot adopt that view. In the first place, we are not concerned here so much with the legal theories of joint-stock associations generally as we are with the practical realities of this particular company. Regardless of legal theories, the stock in this association has an identity and incidents apart from any interest which the shareholders may have in the assets of the association. It begs the question to say that a share of stock represents a prorata interest in the assets of the company. (The plaintiffs point to such statement made in reports of the company to the Interstate Commerce Commission.) In the ultimate sense that is equally true of a share of stock in a corporation. As the court said in *Chicago Corp.* v. *Munds, et al.* (20 Del. Ch. 142, 149) a shareholder in a corporation buys an " aliquot share of a business ". Except on liquidation, however, the share is in the fruits of the business operations, exactly the same in a joint-stock association as in a corporation, and on liquidation the distribution is the same. In the meantime and in either case the stock has its separate identity and quality, as witness the fact that the stock of this company, just like corporation shares, is traded in on the market at prices which bear no close relation to asset value. That is because the price of shares in a going business is more responsive to active and prospective factors than it is to breakup values. There is no reason, therefore, why this stock which in a long market history has always had an identity and value of its own, should be treated on this appraisal as only a reflection of static assets.

A second reason why the court cannot adopt liquidating value as the value of the stock is that the appraisal here does not involve or relate to any liquidation. If the life of the association had been about to expire on July 1, 1944, instead of July 1, 1948, and the alternatives submitted to the stockholders at the June 6, 1944, meeting had been immediate liquidation or an extension of the life of the association, there would be considerable merit in plaintiff's contention. The extension of the life of the

association against their will would then have deprived them of a bird in hand. It would seem fair and reasonable in that event to hold that the dissenters should receive the payment for their shares which a liquidation instanter would produce.[3] But the life of the association was not to end in any event earlier than July 1, 1948, and no one could foretell what the liquidating value of the assets of the association would be at that time. What the plaintiffs were deprived of, therefore, by an extension of the life of the association, was the speculative value of a prorata share in the liquidation of unidentified securities four years hence. Whatever calculation of that value might have been made on June 6, 1944, it is certain that it could not be made simply on the basis of the then liquidating value of the then portfolio. That is undoubtedly why the stock, even in such anticipation as there may have been of termination of the association in 1948, was selling at a substantial discount from net asset value.

A third reason why the court cannot accept asset value as the standard of valuation is the wording of the appraisal clauses of the articles. Had there been any thought on the part of the framers of the articles that valuation of the shares was to be merely a breakdown valuation of the assets, that thought could and would have been clearly expressed in very different language than that employed in the articles. Indeed, reading the articles in their original setting, as plaintiffs suggest, militates against a net asset valuation of the stock. While the eventuating investment trust lends itself to net asset valuation, an express company does not and the value of its stock would be governed much more by operating considerations, earnings, competition and prospects than by net asset value. It would be unfair and unrealistic to value any industrial merely on the basis of the breakup or liquidating value of its assets, and the framers of the Adams articles could not have contemplated any such fixed and arbitrary method of determining the value of its shares. It is to be assumed that the articles contemplated a valuation which was to be fair and compensatory to the dissenters and in most events certainly a valuation of the shares on a going concern rather than on a liquidating basis would be fairer and more advantageous to the dissenters.

[3] It should be pointed out, however, that the articles do not contemplate any different valuation of the shares on a dissent from an extension of the life of the association than from a dissent to any other amendment. The same valuation provision applies to a dissent from any amendment, indicating an intent to value the shares as shares in a going concern rather than one on the verge of liquidation.

The conclusion is inescapable that the articles provide for an appraisal responsive to the conditions and pertinent considerations of the time at which an appraisal is made and that the appraisal is to be of the *shares* of the association as distinguished from any liquidating interest in its assets.

We come now to the adequacy of the appraisal, assuming that it should have been made upon the same basis as the valuation of stock in a corporation. At the outset of this discussion the court must confess to the view, despite the testimony on both sides about "scientific" valuation of securities, that there is no such thing as a scientific valuation of stock. Many factors may enter into a valuation, but which factors and the weight to be accorded them will depend on the individual judgment of the person making the valuation. Therefore, no matter how objective the attempted valuation may be, it is bound to reflect subjective influences, and a valuation of stock will always be a matter of personal judgment rather than a scientific conclusion drawn from the application of well-defined and accepted standards.

No case has attempted either to give a fixed itemization of the factors to be considered in valuing stock or to assign a weight to any particular factor.[4] Some decisions criticize an appraisal for lack of consideration of certain factors, but there is no formula which can be gained from the lawbooks or other texts for valuation of the stock of the Adams Express Company. With full realization of the importance of personal judgment to any appraisal, the articles of association provided for an appraisal by specified appraisers, amounting to a conclusive declaration of intention that their judgment and not

---

[4] As good a statement as may be found of the factors to be considered in valuing stock is that contained in *Matter of Fulton* (257 N. Y. 487, 493, 495): "The appraisers should consider the elements that tend to affect market quotations: the rate of dividends; the regularity with which they have been paid; the management and reputation of the company; its prospects for the future and all other circumstances which will aid them in estimating the future course of the stock in the market. * * * the appraisers should have considered the investment value of the stock which is largely determined by the rate of return, the security afforded that the dividends will be regularly paid, the possibility that dividends will be increased or diminished, the selling price of stocks of like character, the amount of preferred stock in comparison with the common stock, the size of the accumulated surplus applicable to the payment of dividends, the record of the corporation and its prospects for the future. "The appraisers in estimating the fair value of the stock being appraised should give such consideration as to them seems proper to each factor which might enter into such value, and their report as to value should be reasonable and in accordance with the facts proven."

someone else's judgment should determine the value of Adams shares.

Doubt has been cast upon the impartiality and disinterestedness of these appraisers who, as continuing officers of the company, are the servants of the continuing shareholders who stand to gain by any diminution in the amount paid to the retiring shareholders. The infirmity is obvious but must have been equally obvious when the articles were written. The articles are a contract not only between the original associates but also between the company and those who have subsequently become shareholders. All of these plaintiffs became shareholders subject to the provision for valuation of their stock in case of a dissent. The improvidence of the provision affords no basis for substituting the court's judgment or anyone else's judgment for that of the contractually constituted appraisers. This, of course, does not mean that the appraisers may be arbitrary or abuse their trust. They must be held both to good faith and reasonable action in their valuation. The court should not hesitate to set the appraisal aside if it should appear that the appraisers acted in bad faith or reached a result which was unfair and unreasonable after due allowance for reasonable differences in opinion.

It appears here that one of the appraisers started with the predilection that true cash value was market value. The president, who obviously contributed the most to the appraisal, expressed the thought before undertaking the appraisal that true cash value should fall somewhere between market value and net asset value. He testified that the general theory upon which the appraisers proceeded was that true cash value was what a fully informed and willing buyer would be willing to pay for stock from a fully informed and willing seller, which is all right enough. The formal appraisal is a rather elaborate calculation based upon a weighting of several factors. Frankly, some of the factors employed (5 and 6) do not commend themselves to the court, but otherwise the appraisal seems to accord with the requirements of the occasion except for the asserted disregard of asset value. It would seem in the case of an investment trust that if any factor other than market value is to be emphasized, it should be asset value. The court is satisfied that the appraisers did consider asset value, unconsciously if not consciously, and that is the real reason why they added $1 to their calculation, because no other reason appears from the testimony for the addition of the dollar. Although the president testified that asset value was not considered, he also

testified that the dollar was meant to cover " things that we had not thought of which we should have included but didn't." The question comes down to this, therefore, whether $1 is a reasonable allowance for the spread between market and net asset value.

On this question, the significance of market value must be considered. There is good authority to the effect that market value, where it fairly reflects the opinion of informed buyers and sellers, is the best evidence of value for all purposes. (HOLMES, J., in *Nat'l Bank of Commerce* v. *New Bedford,* 155 Mass. 313; L. HAND, J., in *Borg* v. *International Silver Co.,* 11 F. 2d 147, 152; *People ex rel. K. F. Ins. Co.* v. *Coleman et al.,* 107 N. Y. 541, 544.) Even the cases which hold that factors besides market value should be considered do not hold that the resulting figure must be different from market value. They point out that market prices may be a reflection of unusual conditions or " moods ", artificial enhancement or depression, or the market may be too thin to be taken as representative of informed opinion or intrinsic value. (*Matter of Fulton,* 257 N. Y. 487, *supra*; *Chicago Corp.* v. *Munds, et al.,* 20 Del. Ch. 142, *supra*.)

There is nothing in this case, however, to suggest that the market in Adams stock was not a normal market on such a broad base as to establish fairly the value of the stock in the minds of the investing public. There was an average of one thousand shares traded daily on the New York Stock Exchange. Given a market, without abnormal conditions, to which many buyers and sellers come daily to trade, the resulting transactions will more accurately indicate the " cash value " of a stock than any other calculations. The market may not always appear to be in line with earnings, dividends, or asset value, but in the market all the factors which enter into a realistic determination of value are appraised by those who are most realistic, the actual buyers and sellers, and the market prices, reflecting the composite judgment of the informed and interested, are apt to be more significant than any individual opinion.

Market prices are particularly significant in the case of investment trust shares. The complicated considerations of operating factors which enter into the valuation of industrials do not apply, or at least not nearly to the same extent. The periodically published statements tell the whole story and any appraisal is simply a long range opinion of the trust's portfolio and of what the management may do with it. Such an opinion is peculiarly a matter of investor's judgment and is almost entirely a consideration of market factors. The market's evaluation of

investment trust stocks is, therefore, entitled to particular weight.

That there has been a certain investor's prejudice against closed-end investment trusts for the past ten years is apparent from the discount at which their shares have sold under asset value. It would be highly unrealistic and irrational to say, however, that the public appraisal of closed-end investment trusts is unsound and that the true value of their shares is 25% or 30% more than informed investors are willing to pay for such shares. The test of ten years' market experience with investment trust shares must be heeded. That experience proves that the insulation of the shareholders from their investment and the remoteness and uncertainties of liquidation make the cash value of the shares much less than the asset value behind them. It is probably fair to test the market in Adams stock by noting the discount at which it sold in the market around June 6, 1944, as compared with other closed-end investment shares. That discount was about average and had been quite constant for a matter of months, so the market in Adams stock would appear to be normal for such a stock.

What weight then should be given asset value? The court cannot say, in the light of the fairly constant discount of asset value which has been established for investment trust shares, and with the market in Adams true to the pattern, that an allowance of $1 is not sufficient recognition of the factor of net asset value over market value. As the defendants point out in their brief, if net asset value had been included as one of the factors in the appraisal and given the maximum weight given to any other factor, the resulting calculation would have been about $13.30. Or if the four probably most important factors — asset value discounted by the average discount prevailing in respect to investment trust shares, dividend yield capitalized, market price and liquidating value — were all accorded equal weight, the resulting figure would be about $13.30.

The court's conclusion is that the showing here does not warrant setting the appraisal aside. Settle judgment.