Florence W. MASON and Willard M. Mason, Plaintiffs-Appellants,

v.

AMERICAN EXPRESS COMPANY and Howard L. Clark, as President of American Express Company, Defendants-Appellees.

No. 327, Docket 28631.

United States Court of Appeals Second Circuit.

Argued March 5, 1964.

Decided July 2, 1964.

Baker, Nelson, Williams & Mitchell, New York City (C. Dickerman Williams,

New York City, of counsel), for plaintiffs-appellants.

Michels, Gangel & Walton, Brooklyn (L. L. Walton, New York City, of counsel), for defendants-appellees.

Before WATERMAN and KAUFMAN, Circuit Judges, and DIMOCK, District Judge.*

WATERMAN, Circuit Judge.

This appeal presents the important question of whether an unincorporated joint stock association, organized and existing under the laws of the State of New York, should, like a corporate body which has been incorporated there, be deemed a citizen of New York for the purpose of determining whether the diversity of citizenship requirements of Article III, Section 2 of the United States Constitution and 28 U.S.C. § 1332 have been met; or whether such an association is incapable of possessing citizenship for diversity purposes, so that the citizenship of its member shareholders must be looked to in order to determine the existence or absence of the requisite diversity of citizenship. We hold such an association to be a citizen of New York for the purposes of federal diversity jurisdiction.

■■ Plaintiffs, citizens of New Jersey, brought suit against defendant, an express company organized as an unincorporated joint stock association under the laws of the State of New York,[1] in the United States District Court for the Southern District of New York. As the suit was a simple personal injury action, federal jurisdiction could only have been based upon diversity of citizenship. The question whether such jurisdiction in fact existed was raised below by Judge Wyatt, on his own motion, during a

separate trial before the court without a jury on one of two substantive defenses raised by defendant in its answer. After careful consideration of the problem, Judge Wyatt, in a thoughtful and scholarly opinion, 224 F.Supp. 288, concluded "[w]ith great reluctance and with equal regret" that the rule laid down in the 1889 U. S. Supreme Court case of Chapman v. Barney, 129 U.S. 677, 9 S.Ct. 426, 32 L.Ed. 800 (1889), required a determination that defendant joint stock association was itself incapable of possessing citizenship for diversity purposes; and, because some of defendant's more than 20,000 members were shown to be citizens of plaintiffs' home state of New Jersey, Judge Wyatt dismissed the case for want of complete diversity of citizenship between the parties. It is our considered judgment, however, that the Supreme Court has abandoned the artificial and mechanical rule of Chapman v. Barney in favor of a more flexible test for capacity for citizenship, a test which demands that consideration be given to whether an organization's essential characteristics sufficiently invest it, like a corporation, with a complete legal personality distinct from that of the members it represents. And as we are convinced that a New York joint stock association such as this defendant has been legally endowed with essential characteristics that make it resemble a corporate entity much more than a mere aggregation of individuals, we reverse.

■ An essential preliminary to a meaningful analysis of the problem presented by this case is a discussion of the reasons underlying the now firmly established principle that a corporation, for diversity purposes, is deemed to be a citizen of the state of its incorporation. That principle was finally definitely set-

---

* Sitting by designation.

1. Plaintiffs originally named only the American Express Company as a defendant, but by agreement "Howard L. Clark, as President of American Express Company" was added. The obvious reason for the addition of Mr. Clark as a party defendant was to comply with Section 13 of the New York General Associations Law, which provides that an unincorporated association is to be sued in the name of its president or treasurer, and which provision governs the manner of suing such an association in the federal courts sitting in New York because of the provisions of Rule 17(b) of the Federal Rules of Civil Procedure.

tled in 1853, in the case of Marshall v. Baltimore & O. R. R., 57 U.S. (16 How.) 314, 14 L.Ed. 953 (1853).[2] The Court in that case, desiring to prevent the avoidance of federal diversity jurisdiction through the use of the corporate device, noted that diversity jurisdiction had been conferred on federal courts "in order to the inviolable maintenance of that equality of privileges and immunities" accorded to the citizens of the several states,[3] and averred that such a privilege could not legitimately be taken away from the citizens of one state because another state had permitted other citizens to act through the corporate business form. 57 U.S. at 326. The Court countered the

argument that a corporation was a mere artificial person incapable of possessing citizenship with the observation that citizens who have become involved in a controversy with a corporation have not dealt with a mere metaphysical abstraction but with real persons. Although the Court rounded out its analysis with the establishment of a conclusive presumption that all stockholders are citizens of the state of their corporation's incorporation, it is clear that, as stated by another Court some years later, "those who formulated the rule found its theoretical justification only in the complete legal personality with which corporations are endowed."[4] Puerto Rico v. Russell

2. Of course now, because of the 1958 amendment incorporated in 28 U.S.C. § 1332(c), a corporation is, additionally, a citizen for diversity jurisdiction purposes of the state of its principal place of business. The declared primary purpose of the amendment was to prevent local institutions from gaining admittance to federal courts in suits with local citizens by the device of incorporating in some other state. See S.Rep. No. 1830, 85th Cong., 2d Sess. (1958), in 1958 U.S.Code Cong. & Adm. News, p. 3099, 3101–02. Also important was the reduction of the federal court caseload thereby achieved. Id. at 3100.

3. Quoting The Federalist, No. 80.
The entire paragraph from which the quoted excerpt is taken reads:
"It may be esteemed the basis of the Union, that 'the citizens of each State shall be entitled to all the privileges and immunities of citizens of the several States.' And if it be a just principle that every government *ought to possess the means of executing its own provisions by its own authority*, it will follow, that in order to the inviolable maintenance of that equality of privileges and immunities to which the citizens of the Union will be entitled, the national judiciary ought to preside in all cases in which one State or its citizens are opposed to another State or its citizens. To secure the full effect of so fundamental a provision against all evasion and subterfuge, it is necessary that its construction should be committed to that tribunal which, having no local attachments, will be likely to be impartial between the different States and their citizens and which, owing its official existence to the Union, will never be likely to feel any bias inauspicious to

the principles on which it is founded." (Emphasis in original.)

4. It is interesting to note that the use of this device of the residence presumption was in fact necessitated by the way the majority in the Marshall case dealt with the argument that a corporation, as an abstract entity apart from the people who comprised it, could not be endowed with the quality of citizenship. As has been explained already, the Court met this argument by emphasizing that a corporation was simply the representative of an aggregation of flesh and blood citizens. This emphasis upon the aggregate, rather than the separate, personality of the corporation, however, could have served effectively to bar the establishment of complete diversity in most corporate suits by leading to a requirement that the citizenship of all the shareholders forming the "aggregation of shareholders" be taken into account. Compare the dissenting opinion of Catron, J., 57 U.S. at 338. The Court chose to avoid this quandary by establishing a conclusive presumption about shareholder citizenship which, in almost all cases, was in fact false; i. e., that all shareholders were citizens of the state of their corporation's incorporation. Thus, the Court in Marshall was really faced with the two faceted problem of, first, whether a corporation was capable of being sued like a citizen, and, second, if so, where that citizenship was to attach. One facet required the Court to place emphasis upon the aggregate character of a corporation, and the other facet called for the placing of emphasis upon the separate identity of a corporation. Of course, in subsequent years, only the Court's emphasis on the separate per-

& Co., 288 U.S. 476, 479, 53 S.Ct. 447, 448, 77 L.Ed. 903 (1933).

Thirty-five years after its decision in Marshall v. Baltimore & O. R. R., the Supreme Court handed down Chapman v. Barney, supra, in which it refused, in a brief opinion, to expand the rule which accorded separate citizenship to corporations so as also to embrace a New York joint stock association. As we have already indicated, and as we will explain more fully later in this opinion, our refusal to regard Chapman v. Barney as controlling law today stems primarily from our belief that the Supreme Court, some forty years after Chapman v. Barney, decided to depart from it. In addition, however, we think it advisable to note now several characteristics of the Chapman v. Barney decision which could well have forewarned of an eventual abandonment of it by the Court which handed it down, despite reaffirmation of it twice within the fifteen years following that decision, Thomas v. Board of Trustees, 195 U.S. 207, 25 S.Ct. 24, 49 L.Ed. 160 (1904); Great Southern Fire Proof Hotel Co. v. Jones, 177 U.S. 449, 20 S.Ct. 690, 44 L.Ed. 842 (1900), and despite a faithful adherence to it in the lower federal courts. See, e. g., in this Circuit, Levering & Garrigues Co. v. Morrin, 61 F.2d 115 (2 Cir. 1932), aff'd with grant of certiorari limited to another question, 289 U.S. 103, 53 S.Ct. 549, 77 L.Ed. 1062 (1933); Ex parte Edelstein, 30 F.2d 636 (2 Cir.), cert. denied, Edelstein v. Goddard, 279 U.S. 851, 49 S.Ct. 347, 73 L.Ed. 994 (1929).[5]

The first point of significance about the Chapman v. Barney decision is that the jurisdictional question there dealt with, because of the peculiar combination of circumstances attending the appeal in the case, was neither briefed nor argued by either party. The case was submitted instead of argued, no appearance was entered for the appellee, and the appellant did not assign as error any lack of jurisdiction by the court below. The jurisdictional issue was raised by the Court on its own motion, and, after discussing briefly the three assignments of error set forth by the appellant, the Court in a brief, four-sentence paragraph discussed and resolved the question of whether the appellee joint stock corporation could have capacity for citizenship separate from the citizenships of its members. Of course this litigation history in no way detracts from the holding in that case, but it should, nevertheless, make a court today hesitant to follow the rule spawned by this 1889 decision if significant present-day reasons for not doing so exist. Secondly, the Court in Chapman v. Barney simply stated flatly that the appellee joint stock company could not "be a *citizen* of New York * * * unless it be a corporation," 129 U.S. at 682, 9 S.Ct. at 428 (emphasis in original), without making any effort to analyze the rationale of Marshall v. B. & O. R. R. in order to determine whether the reasons for extending citizenship to a corporation might apply with equal force to a joint stock association. This use of labels in place of a careful analysis was particularly ironic in view of the admonition in the Marshall opinion that "it is not reasonable that those who deal with such persons [persons doing

sonality of a corporation came to be associated with the Marshall decision. See, e. g., Puerto Rico v. Russell & Co., above cited. For the view that the Court in Marshall v. B. & O. R. R. completely sidestepped a holding that a corporation was a citizen, see Moore & Weckstein, Corporations and Diversity of Citizenship Jurisdiction: A Supreme Court Fiction Revisited, 77 Harv.L.Rev. 1426, 1428 (1964).

5. Both of these cases involved, as do many cases in this field of the law, unincorporated labor unions. Since the rule of

Chapman v. Barney was thus applied to slightly different fact situations, it could be argued that the cases represented a broadening of the Chapman v. Barney doctrine. However, inasmuch as labor unions, particularly in the stage of their development at the time of these decisions, were much the less separate legal personalities and much the more aggregations of their members than was the joint stock association under examination in Chapman v. Barney, it is less than realistic to regard these decisions as having extended the rule of Chapman v. Barney.

business through corporations] should be deprived of a valuable privilege by a syllogism, or rather sophism, which deals subtly with words and names, without regard to the things or persons they are used to represent." 57 U.S. at 327–28. Thirdly, the Court failed even to mention its prior decision in Liverpool Insurance Co. v. Massachusetts, 77 U.S. (10 Wall.) 566, 19 L.Ed. 1029 (1870), where it had concluded that an English insurance company doing business in this country, though organized in England as a joint stock company, was, because of its essential characteristics, to be treated as if it were a corporation for purposes of the privileges and immunities clause of the United States Constitution and the Treaty of 1815 between this country and Great Britain.[6] Finally, the Court in Chapman v. Barney appears to have directed so much of the little discussion it devoted to this general issue to emphasizing that New York could not make a joint stock association subject to the jurisdiction of a federal court merely by investing it with the capacity to sue in the name of its president that it failed to consider whether other legal characteristics accorded to a joint stock association under New York law might not have required that it be treated like a corporation for diversity of citizenship purposes.[7]

That a change from the Chapman v. Barney approach toward the status of a joint stock association was not too far off was indicated by the decision in United States v. Adams Express Co., 229 U.S. 381, 33 S.Ct. 878, 57 L.Ed. 1237 (1913), in which the Court held that a New York joint stock association was subject to the provisions of a federal statute regulating interstate commerce rates and was indictable and punishable as a separate entity, like a corporation, for violations of that statute. While that decision was primarily based on the interpretation accorded the relevant regulating statute, and while the Court cited Chapman v. Barney and cases following it in explanation of the unsuccessful appellant's argument and did not either explicitly approve or disapprove them, the characterization of a joint stock association under New York law which the Court in Adams Express used to bolster its decision is extremely significant when compared with Chapman v. Barney's appraisal of the same type of organization. Justice Holmes, writing for a unanimous Court, reviewed the basic characteristics with which joint stock associations had been endowed under New York law, and concluded that these "characteristics of separate being" showed "the semicorporate standing that these companies already had locally as well as in the popular mind." 229 U.S. at 390, 33 S.Ct. at 879. This was a far cry indeed from Chapman v. Barney's earlier description of a joint stock associ-

6. Of course, equating a joint stock association with a corporation for purposes of the privileges and immunities clause had the effect of deeming it not a citizen, a result the opposite of that which would result from treating a joint stock association like a corporation for diversity jurisdiction purposes. What is significant, however, is that the Court in the Liverpool Insurance Co. case, in deciding whether to treat a joint stock company like a corporation, turned its decision not on the presence or absence of a corporate label but on the extent to which the joint stock association's essential characteristics paralleled those of a corporation.

7. The confusion between capacity for suit and capacity for citizenship for jurisdictional purposes is a pitfall into which other courts have fallen. For example, the decision in Van Sant v. American Express Co., 169 F.2d 355 (3 Cir. 1948), which held an unincorporated joint stock association to be capable of citizenship, appears to have been based on the fact that Pennsylvania law, made binding on the lower federal court because of Rule 17(b) of the Federal Rules of Civil Procedure, permitted an unincorporated association to sue and be sued in its own name. For discussion of the case as to this point, see Judge Wyatt's opinion below, 224 F.Supp. at 294. See also Brocki v. American Express Co., 279 F.2d 785, 788 (6 Cir. 1960) (erroneously characterizing the Van Sant conclusion as dictum); Swan v. First Church of Christ, Scientist, 225 F.2d 745, 748 n. 3 (9 Cir. 1955).

ation as "a mere partnership." 129 U.S. at 682, 9 S.Ct. 426.

In 1933 the Supreme Court, in Puerto Rico v. Russell & Co., supra, decided to treat a Puerto Rican business organization as a citizen for jurisdictional purposes despite the fact that it was not a corporation; and although the break with the past there achieved was not as clean as it might otherwise have been, since the Court cited Chapman v. Barney without explicitly overruling it, we are nevertheless satisfied that the break was a clear one. Puerto Rico had brought suit in its Insular District Court against a business organization called a *sociedad en comandita*, which was organized under the laws of Puerto Rico but whose members were all domiciled outside of the island. The *sociedad* removed the case to the United States District Court for the District of Puerto Rico, which had jurisdiction over controversies involving federal questions and over those involving a requisite amount of money in which all of the parties on one side were either citizens of a foreign state or citizens of the United States not domiciled in Puerto Rico. It was on the question of the propriety of the removal that the case reached the United States Supreme Court. As the Court found that the case involved no federal question, and as all of the individual members of the *sociedad* were domiciled outside of Puerto Rico, the presence or absence of jurisdiction of the Puerto Rican Federal District Court over the case, and hence the propriety of the removal, depended upon whether the *sociedad* was, like a corporation, to be treated as a citizen and domiciliary of Puerto Rico.

The Court, citing Marshall v. Baltimore & O. R. R., supra, and cases following it, first stated that corporations had been treated as citizens for diversity purposes because "treatment of the aggregate for other purposes as a person distinct from its members, with capacity to perform all legal acts, made it possible and convenient to treat it so for purposes of federal jurisdiction as well," 288 U.S. at 480, 53 S.Ct. at 448, and then moved to a consideration of whether the essential characteristics of a *sociedad* under Puerto Rican law demanded that it, like a corporation, be considered capable of possessing a separate citizenship.

Among the characteristics of the *sociedad* under Puerto Rican law which the Court listed as important indicia of that organization's status as a distinct legal person were the following: its creation by articles of association filed as public records; its capacity to contract, own property, transact business, and sue and be sued in its own name and right; its ability to endure for a prescribed period regardless of the death or withdrawal of individual members; the preference granted its creditors to reach its property and assets ahead of the creditors of its individual members; and the vesting of the powers of management over its affairs in the hands of managers who alone could perform acts legally binding on it. The Court recognized that a *sociedad* differed from a corporation in that its members were personally liable for the debts of the *sociedad* in the event that the organization's assets were insufficient to satisfy such debts, and the Court proceeded to reject this as a legitimate reason for refusing to accord a *sociedad* the capacity for citizenship possessed by a corporation, stating that "this liability is of no more consequence for present purposes than that imposed on corporate stockholders by the statutes of some states." 288 U.S. at 481, 53 S.Ct. at 449. The Court completed its analysis of the nature of the *sociedad* by concluding that it was a "juridical person" with a personality "so complete in contemplation of the law of Puerto Rico that we see no adequate reason for holding that the *sociedad* has a different status for purposes of federal jurisdiction than a corporation organized under that law." 288 U.S. at 482, 53 S.Ct. at 449.[8] This sys-

8. Though we recognize, as have others, that as far as the actual result in the

case was concerned, the holding in Puerto Rico v. Russell & Co. had the effect of

tematic appraisal of an organization's essential features under the law of its creation, in order to determine whether these features entitled it to the same treatment as a separate juridical person for diversity purposes as that accorded a corporation, must be regarded as representing a clear departure from Chapman v. Barney's basic assumption that only corporations were entitled to treatment as separate citizens for diversity purposes, and a departure from that case's consequent mechanical determination of the issue of capacity for citizenship on the basis of whether a state had or had not pinned on an organization the corporate label.

While Puerto Rico v. Russell & Co.'s citation of Chapman v. Barney without explicitly overruling that decision, coupled with certain language from the Puerto Rico v. Russell & Co. opinion, has led at least one other court than the court below to conclude that the decision in Puerto Rico v. Russell & Co. left the rule of Chapman v. Barney intact, Brocki v. American Express Co., 279 F.2d 785, 788–789 (6 Cir.), cert. denied, 364 U.S. 871, 81 S.Ct. 113, 5 L.Ed.2d 92 (1960), we are not so persuaded.[9] There are two portions of the Puerto Rico v. Russell & Co. opinion which have been used to support the argument that the rule of Chapman v. Barney was there left undisturbed. One is the statement, made in connection with a discussion of the general reasons for treating an organization as a separate entity for diversity purposes, that "status as a unit for purposes of suit alone, as in the case of a joint-stock company [citing Chapman v. Barney and a case from this Circuit following it], or a limited partnership, not shown to have the other attributes of a corporation [citations], has been deemed a legal personality too incomplete; what was but an association of individuals for so many ends and a juridical entity for only a few was not easily to be treated as if it were a single citizen." 288 U.S. at 480, 53 S.Ct. at 448. The other is the two-sentence introduction to the paragraph immediately following the above: "The tradition of the common law is to treat as legal persons only incorporated groups and to assimilate all others to partnerships. [Citing Chapman v. Barney and Great Southern Fire Proof Hotel Co. v. Jones, supra.] The tradition of the civil law, as expressed in the Code of Puerto Rico, is otherwise." Ibid. There are a number of reasons why we cannot regard these two statements plucked out of the Puerto Rico v. Russell & Co. opinion as reasonably supporting to our satisfaction the position that that case did not really represent a break with the tradition of Chapman v. Barney.

First, the very sharp contrast between the exclusive mechanical rule of label

preventing rather than of permitting the assumption of federal jurisdiction, see Hart & Wechsler, The Federal Courts and the Federal System 917–918 (1953), we attach no relevance to that observation for present purposes. Even as to the *sociedad* there a party, the holding meant that federal diversity jurisdiction could thereafter be acquired in any suit between it and a plaintiff or defendant who was not a citizen of Puerto Rico. Moreover, making any organization a citizen of one place, rather than requiring that it have the "citizenship" of its members everywhere that it has members, certainly renders the chances of acquiring federal diversity jurisdiction much greater in any future suits involving it. In short, no more significance should be accorded the result in the case than the fact that, a corporation being regarded as a citizen of the state of its incorporation, diversity jurisdiction in suits between a corporation and a citizen of the state of its incorporation cannot be established.

9. Leading commentators in this field of the law have stated it to be their belief that Puerto Rico v. Russell & Co. was a departure from previously controlling principles. Hart & Wechsler, supra, note 8, at 917 (1953) (referring to Puerto Rico v. Russell & Co. as the one instance in which "the Supreme Court appeared to be moving in a direction of treating such associations [unincorporated associations] as entities for diversity purposes"); 3 Moore, Federal Practice 1413 (2d ed. 1963) (describing Puerto Rico v. Russell & Co. as evidence "that the present federal rule is undergoing a change").

denomination adopted in Chapman v. Barney and the detailed analysis of essential legal characteristics which was the very heart of the decision in Puerto Rico v. Russell & Co. should serve to point up the unwisdom of concluding, on the basis of language spotlighted in the latter, that these two cases are in harmony. Moreover, the very nature of the citation to Chapman v. Barney indicates that, while the Court in Puerto Rico v. Russell & Co. did not explicitly overrule the decision, it did effectively confine within rather narrow limits the declared scope of the holding in the older case. Chapman v. Barney and cases following it were cited for the proposition that "status as a unit for purposes of suit alone * * * has been deemed a legal personality too incomplete," thus highlighting that portion of Chapman v. Barney which was concerned with emphasizing that one of the states, by granting an organization the capacity to sue and be sued, could not make that state-created organization subject to federal diversity jurisdiction.[10] This limitation upon the scope of Chapman v. Barney leaves a court free—as indeed, it left the Court in Puerto Rico v. Russell & Co. free—to consider, in a fashion completely contrary to the spirit of Chapman v. Barney, the other essential characteristics of an organization under review to see whether those characteristics make it a complete enough legal personality to warrant treating it as a separate entity for diversity jurisdiction purposes. Furthermore, this analysis of essential legal characteristics also demonstrates the unreasonableness of concluding that Puerto Rico v. Russell & Co. was in tune with the label denominating tradition of Chapman v. Barney because of the Court's reference to the "tradition of the civil law" as expressed in the Code of Puerto Rico. What the Court in Puerto Rico v. Russell & Co. demonstrated it was concerned with was not the label which Puerto Rican civil law had affixed to a *sociedad*, but rather the nature of the collection of meaningful legal characteristics with which that law had endowed a Puerto Rican *sociedad*.[11] Finally, as will be presently demonstrated, the remarkable extent to which a New York joint stock association resembles the *sociedad* which was subject to review in Puerto Rico v. Russell & Co. makes it impossible for us to adopt the position that the Court in Puerto Rico v. Russell & Co., in ruling that a *sociedad* was to be treated as a separate entity for diversity purposes, did not really undercut the holding of Chapman v. Barney. Having thus rather laboriously set to rest the matter of the vitality of Chapman v. Barney, we move now to a discussion, under the test set out in Puerto Rico v. Russell & Co., of the treatment to be accorded the New York joint stock association in the case before us.

■ Under New York law an unincorporated joint stock association, such as this defendant, is created pursuant to written articles of association which must be filed, like a certificate of incorporation, as a public record. New York General Associations Law, §§ 2–4. The association may, like this defendant which has more than 20,000 shareholders, have capital stock divided into shares, and provision may be made in the articles of association that upon the death of a shareholder or the transfer of his shares no dissolution is to be worked on the association. New York General Associations Law, §§ 2, 3, 5. A dissolution may take place, however, as it may with a corporation, through group shareholder action or judicial order. Compare New York General Associations Law, § 5 with New York Business Corporation Law,

10. See text accompanying note 7, supra.

11. That the Court's primary concern was not with whether the tradition of Puerto Rico's civil law had formally declared a *sociedad* to be a separate entity, but rather with whether the essential characteristics of a *sociedad* under that law really gave it a separate legal personality, is seen by the Court's statement, made after thoroughly reviewing the basic features of the *sociedad*, that "These characteristics under the Codes of Puerto Rico *give content to their declaration* that the *sociedad* is a juridical person." 288 U.S. at 482, 53 S.Ct. at 449 (Emphasis added.)

§§ 1001–02, 1101–04. Powers of management over the association's affairs may be concentrated in the sole hands of directors, who may number as few as three. New York General Associations Law, § 3. The association may purchase, take, hold, and convey real property in the name of its president under a variety of circumstances, New York General Associations Law § 6, and an action may be maintained by or against such an association in the name of its president or treasurer, without joining as parties the shareholder members. New York Constitution, art. 10, § 4; New York General Associations Law, §§ 12, 13.[12] Moreover, shareholder members of a joint stock company may themselves bring suit against the association. Westcott v. Fargo, 61 N.Y. 542 (1875); Gillette v. Allen, 184 Misc. 424, 53 N.Y.S.2d 920 (S.Ct., Monroe Cty.), rev'd on other grounds, 269 App.Div. 441, 56 N.Y.S.2d 307 (4th Dep't 1945). Shareholders of a joint stock association are personally liable for the debts of the association, e. g., People ex rel. Winchester v. Coleman, 133 N.Y. 279, 31 N.E. 96, 16 L.R.A. 183 (1892); National Bank v. Van Derwerker, 74 N.Y. 234 (1878), but once an action has been brought against the association the individual shareholders may not be sued on the same cause unless a final judgment against the association has been returned wholly or partially unsatisfied. New York General Associations Law, § 16. On the basis of these and similar statutory provisions, New York's decisional law has for many years consistently recognized the corporate characteristics of joint stock associations. See, e. g., Hibbs v. Brown, 190 N.Y. 167, 82 N.E. 1108 (1907); Matter of Jones' Estate, 172 N.Y. 575, 65 N.E. 570, 60 L.R.A. 476 (1902); People ex rel.

Winchester v. Coleman, supra; Jones v. Healy, 184 Misc. 923, 55 N.Y.S.2d 349 (Sup.Ct.N.Y.Cty.1945), aff'd mem., 270 App.Div. 895, 62 N.Y.S.2d 605 (1st Dep't 1946). In Hibbs v. Brown, supra, New York's leading case on the nature of the joint stock association, the Court of Appeals, holding that, despite the individual liability of shareholder members, a bond issued upon a joint stock association's general credit was not made non-negotiable as containing only a promise to pay out of a particular fund, noted, after reviewing a joint stock association's basic characteristics, "the complete and separate existence of the association as between it and the individual members" and stated that "[b]ased upon such statutory provisions, decisions have been made and opinions written emphasizing their corporate character as distinguished from the ordinary partnership, wherein the individual relationship and liability of the members is universally recognized and of importance." 190 N.Y. at 177–78, 82 N.E. at 1111.

We think it clear that, under the reasoning of Puerto Rico v. Russell & Co., supra, these essential characteristics of a New York joint stock association such as this defendant sufficiently invest it with a legal personality apart from its individual members, so that it is just and sensible to regard it as a separate entity for purposes of diversity of citizenship jurisdiction. Indeed, a comparison between the New York joint stock association and the *sociedad* which was deemed a citizen in Puerto Rico v. Russell & Co. indicates not only that the joint stock association is as much like a true corporate body as the *sociedad*, but also that the important characteristics of the *so-*

---

12. The applicable provision of the New York State Constitution makes an explicit reference to the parallelism of a joint stock association and a corporation in this, and other, ways. The provision reads as follows:

"The term corporations as used in this section, and in sections 1, 2 and 3 of this article shall be construed to in-

clude all associations and joint-stock companies having any of the powers or privileges of corporations not possessed by individuals or partnerships. And all corporations shall have the right to sue and shall be subject to be sued in all courts in like cases as natural persons."

*ciedad* and the joint stock association are almost identical.

While the joint stock association does differ from an ordinary corporation because of the individual liability of the former's shareholders, we think that there exist a number of compelling reasons for refusing to permit this single difference amid so many similarities to cause us to hold the joint stock association incapable of possessing separate citizenship. First, the individual liability of the shareholder members of a New York joint stock association, operative, when the association has been sued, only after a judgment against it has been returned unsatisfied, is almost indistinguishable from the contingent individual liability which the shareholder members of the *sociedad* had in Puerto Rico v. Russell & Co. The Court in that case said of that liability: "Although the members whose participation is unlimited are made contingently liable for the debts of the *sociedad* in the event that its assets are insufficient to satisfy them * * * this liability is of no more consequence for present purposes than that imposed on corporate stockholders by the statutes of some states." 288 U.S. at 480, 53 S.Ct. at 448. Moreover, the individual liability of shareholders in a New York joint stock association has been deemed by New York's highest court, in the leading New York case on the subject of joint stock associations, "practically unimportant," Hibbs v. Brown, supra, at 177 of 190 N.Y., 82

N.E. 1108, and one New York court has even reasoned that the contingent nature of this liability indicates "the legislative intent to treat associations in some respects as a corporation sole." Gillette v. Allen, supra, 53 N.Y.S.2d at 922. In addition, personal liability of individual shareholders, even as to certain corporations, is a type of liability not completely absent from New York law. See New York Banking Law, § 113–a (making shareholders in a banking or trust company corporation individually responsible for debts of their corporation to the extent of the par value of their stock holdings, over and above the amount invested in the shares of stock); New York Business Corporation Law, § 630 (making the ten largest shareholders of a corporation whose shares are not nationally quoted or listed liable for unpaid debts and wages owing by the corporation to its employees). Finally, from a purely practical standpoint we note in passing that the extent of the business operations and financial resources of this particular joint stock association, a giant nationwide express company, makes the possibility of the theoretical liability of individual shareholders actually becoming operative, a liability contingent and somewhat remote to begin with, highly unlikely. Thus, we hold this defendant joint stock company, though not a corporation but an unincorporated joint stock company, a citizen of the state of its creation, New York, for purposes of federal diversity jurisdiction.[13]

13. We need not consider whether, absent the passage of legislation, such an association should also be deemed to be, like a corporation, a citizen of the state of its principal place of business. We note, however, that the extension of dual citizenship to corporations was not, like the original treatment of a corporation as a citizen of the state of its incorporation, the result of judicial decision, but was achieved through specific legislation. See note 2, supra.

As a connected point, we also note in passing that this court has, in the past, cited as a practical reason for refusing to extend the corporate rule to one type of unincorporated association other than a joint stock association (a union), the lack of any state of formal organization, such as a corporation's state of incorporation, where the unincorporated association could be said to be a citizen. Levering & Garrigues Co. v. Morrin, 61 F.2d 115 (2 Cir. 1932), aff'd with grant of certiorari limited to another question, 289 U.S. 103, 53 S.Ct. 549, 77 L.Ed. 1062 (1933). Irrespective of whether we would still regard this as a legitimate reason for refusing to extend the capacity for citizenship for diversity purposes to other types of unincorporated associations, this objection does not apply to an association such as this defendant, created by publicly recorded written articles of association under the laws of New York.

The justice in this approach to federal diversity jurisdiction is clear to us. Persons dealing with an unincorporated joint stock association such as this defendant deal with a cohesive entity, not a mere aggregation of individuals, cf. Marshall v. Baltimore & O. R. R., supra, at 327, of 57 U.S., and, apart from what seems clearly called for by the decision in Puerto Rico v. Russell & Co., all of the reasons in favor of extending citizenship to corporations for diversity purposes would seem to apply with equal force to a joint stock association.[14] Moreover, although the court below made no express finding on this issue, the size of this association's operations and the number of its shareholders make it not unlikely that it has shareholders in all fifty states in the union, and, if so, a refusal to treat it as a legal entity would entirely foreclose access by it, as either plaintiff or defendant, to the federal courts in diversity cases.

The injustice of a rule forbidding the extension of separate status to unincorporated associations has been recognized even by courts which have felt constrained to follow such a rule; and this recognition has come in cases dealing with types of unincorporated associations which would appear to have fewer corporate attributes than New York joint stock associations. Calagaz v. Calhoon, 309 F.2d 248, 251 (5 Cir. 1962) (labor union); Arbuthnot v. State Automobile Insurance Ass'n, 264 F.2d 260, 262 (10 Cir. 1959) (unincorporated insurance exchange); Nedd v. United Mine Workers, 225 F.Supp. 750, 752 (E.D.Pa.1963) (la-

bor union). So widespread has been the discontent with the doctrine preventing treatment of unincorporated associations as citizens for diversity purposes that class suit against the members of such associations, in which the diversity of citizenship requirement need be satisfied only as to the representatives of the class, Supreme Tribe of Ben-Hur v. Cauble, 255 U.S. 356, 41 S.Ct. 338, 65 L.Ed. 673 (1921), has been generally recognized as a legitimate device for circumventing the doctrine and thereby preventing a failure of justice. See Marydale Prods. Co. v. United Packinghouse Workers, 322 F.2d 224, 227 (5 Cir. 1963); Calagaz v. Calhoon, supra; Underwood v. Maloney, 256 F.2d 334, 341 (3 Cir.) (on petition for rehearing), cert. denied, 358 U.S. 864, 79 S.Ct. 93, 3 L.Ed.2d 97 (1958);[15] Tunstall v. Brotherhood of Locomotive Firemen, 148 F.2d 403 (4 Cir. 1945); Sperry Prods., Inc. v. Association of American R.R.'s, 132 F.2d 408, 412 (2 Cir. 1942); International Allied Printing Trades Ass'n v. Master Printers Union, 34 F.Supp. 178 (D.N.J.1940); Hart & Wechsler, The Federal Courts and the Federal System 918 (1953); 3 Moore, Federal Practice 1413 (2d ed. 1963). Particularly revealing are Tunstall v. Brotherhood of Locomotive Firemen, supra, in which the court strained to interpret as a class action a suit naming two unions as well as their officers as defendants, and International Printing Trades Ass'n v. Master Printers Union, supra, in which the court reopened the case in order to permit the suing union to establish its right to proceed through the de-

14. For some suggestions of modern reasons in favor of corporate citizenship for diversity purposes, see Moore & Weckstein, Corporations and Diversity of Citizenship Jurisdiction: A Supreme Court Fiction Revisited, supra, note 4, at 1445–1451.

15. Though the court in Underwood v. Maloney recognized the class suit as a device for acquiring diversity jurisdiction over an unincorporated labor union, it ruled that such a device was unavailable in that particular case. The court reasoned that Rule 17(b) of the Federal Rules of Civil Procedure, providing that the capacity to

sue and be sued in certain cases is governed by state law, required that result, for the law of Pennsylvania prevented class suits by or against labor unions. For criticism of the case on the ground that Rule 17(b) deals not with suits against individuals through their representatives but with suits against entities, and on the further ground that the court in Underwood v. Maloney so interpreted Rule 17(b) as to undercut Rule 23(a), see Note, the Problem of Capacity in Union Suits: A Potpourri of Erie, Diversity and the Federal Rules of Civil Procedure, 68 Yale L.Rev. 1182 (1959).

vice of a class suit. Less indirect means of eliminating the harshness of the doctrine that forecloses separate entity treatment for unincorporated associations have also been suggested. Section 1301(b) (2) of the proposed jurisdictional statute set forth in the American Law Institute's published Study of the Division of Jurisdiction between State and Federal Courts, Tentative Draft No. 2 (1964), provides that for diversity purposes, "A partnership or other unincorporated association capable of suing or being sued in its common name in the State in which an action is brought shall be deemed a citizen of the State or foreign state where it has its principal place of business, and such citizenship shall be controlling in determining jurisdiction in such action, whether brought by or against such partnership or unincorporated association or by or against any person as an agent or representative thereof." This proposed statute, which covers all types of unincorporated associations, and ordinary partnerships as well, is particularly significant, for the draft as a whole is designed to reduce the scope of federal diversity jurisdiction, yet this particular provision would significantly increase the number of cases which could meet the diversity requirements.

We do not mean to intimate, by our allusion to the criticism which has been directed toward the current doctrine dealing with unincorporated associations generally, any view as to whether separate entity treatment ought also to be accorded types of unincorporated associations other than the type now before us,

for many would appear to possess fewer attributes of a separate juridical personality than does a New York joint stock association.[16] The determination of such an issue would necessarily have to involve consideration of whether to depart from a line of decisions in this Circuit, proceeding from cases decided before the advent of Puerto Rico v. Russell & Co., supra, wherein we have heretofore refused to extend separate entity treatment to unincorporated associations of this sort. See A. H. Bull S.S. Co. v. National Marine Engineers' Ass'n, 250 F.2d 332 (2 Cir. 1957); Steele v. Guaranty Trust Co., 164 F.2d 387 (2 Cir. 1947), cert. denied, 333 U.S. 843, 68 S.Ct. 661, 92 L.Ed. 1127 (1948); Rosendale v. Phillips, 87 F.2d 454 (2 Cir. 1937) (per curiam); Levering & Garrigues Co. v. Morrin, 61 F.2d 115 (2 Cir. 1932), aff'd with grant of certiorari limited to another question, 289 U.S. 103, 53 S.Ct. 549 (1933); Ex parte Edelstein, 30 F.2d 636 (2 Cir.), cert. denied, 279 U.S. 851, 49 S.Ct. 347 (1929). What we do decide is that the 1889 decision of Chapman v. Barney, supra, is no bar today to denominating a New York joint stock association a citizen for diversity purposes; and that, on the basis of the test set forth in Puerto Rico v. Russell & Co. such an association possesses, because of its essential characteristics under the law of its creation, a complete enough separate legal personality to be treated as a citizen for purposes of federal diversity jurisdiction.

The decision below is reversed and the cause remanded for disposition on the merits.

---

16. For the view, based on the Supreme Court's analysis in United Mine Workers v. Coronado Coal Co., 259 U.S. 344, 42 S.Ct. 570, 66 L.Ed. 975 (1922), that the large modern labor union possesses attributes of a juridical personality even more compelling than those of the *sociedad* in Puerto Rico v. Russell & Co., supra, see American Fed'n of Musicians v. Stein, 213 F.2d 679 (6 Cir.), cert. denied, 348 U.S. 873, 75 S.Ct. 108, 99 L.Ed. 687 (1954). The court in the Stein case, however, did not issue a definite ruling that unions could be treated as separate entities for jurisdictional purposes, but merely ruled that the lower court had properly issued a temporary injunction against the union so as to give that court time to consider the diversity of citizenship question, and indicated that that question was one properly for the lower court on remand to consider in the first instance. On remand, the lower court decided that the defendant union could not be regarded as a separate entity for diversity of citizenship purposes, 183 F.Supp. 99 (M.D.Tenn. 1960), and we do not find that the district court's decision was ever appealed.