Harold FOX, plaintiff, for himself and on behalf of all others similarly situate

v.

PRUDENT RESOURCES TRUST et al.

Civ. A. No. 73-972.

United States District Court,
E. D. Pennsylvania.

Sept. 18, 1974.

84

Charles M. Golden and Gary Green, Philadelphia, Pa., for plaintiff.

Judith R. Cohn, Edward Greer, Philadelphia, Pa., for defendants.

## OPINION

LUONGO, District Judge.

Plaintiff, Harold Fox, a limited partner in Prudent Resources Oil and Gas Program (Program), a New York limited partnership, brings this action against defendant Prudent Resources Trust (Prudent), a New York business trust which is a general partner in the Program, and various named individuals also instrumental in running the Program, alleging acts of securities fraud, corporate mismanagement and breach of fiduciary duty. Specifically, Fox' complaint alleges violations of § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), more particularly, Rule 10b–5, 17 C.F.R. § 240.10b–5, promulgated thereunder; § 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q (a); various sections of the Investment Company and Investment Advisors Acts, 15 U.S.C. § 80a–1 et seq.; and the applicable provisions of Pennsylvania corporation law. Federal jurisdiction is predicated upon § 27 of the 1934 Act, 15 U.S.C. § 78aa; §§ 17 and 22 of the 1933 Act, 15 U.S.C. §§ 77q and 77v; § 44 of the Investment Company Act, 15 U.S.C. § 80a–43, and diversity of citizenship.

Defendants Prudent Resources Trust, Milton G. Gershenson, Simon Kaplan, Abraham Sanders and the Estate of Benjamin Rosenberg (sometimes hereinafter collectively referred to as Prudent) have filed a motion to dismiss for failure to state a claim on which relief can be granted. F.R.C.P. 12(b)(6). Defendant Harold Seth Leader has joined in that motion. An answer was filed on behalf of the Estate of I. Theodore Leader, Bruce G. Leader, and BGL Oil Company. Thereafter, Bruce G. Leader and BGL Oil Company moved to dismiss and for summary judgment for lack of jurisdiction and improper venue. That motion is denied for reasons stated from the bench at oral argument. Before the court is Prudent's (and by joinder, Harold Seth Leader's) motion to dismiss.[1]

On a motion to dismiss, of course, all well pleaded facts in the complaint must be accepted and the complaint must be viewed in the light most favorable to the plaintiff. The complaint may not be dismissed unless it appears certain that the plaintiff would not be entitled to relief under any state of facts which could be proven in support of his claim, e. g., Frederick Hart & Co. v. Recordgraph Corp., 169 F.2d 580 (3d Cir. 1948); Melo-Sonics Corp. v. Cropp, 342 F.2d 856 (3d Cir. 1965). Read in this light, the complaint alleges the following: The Program was instituted in late January 1969, with Prudent becoming its general partner on April 30, 1969. Soon afterward, Prudent and the Program, by means of a written prospectus placed in interstate commerce, invited the general public to purchase shares in the newly created limited partnership. The prospectus informed the public that the Program would be a partnership lasting for ten years and that management and control of the business would reside exclusively with Prudent, the Program's only general partner. The investments made

---

[1]. There is also pending a motion by plaintiff asking for a class action determination. The parties have agreed that disposition of the class action motion should be deferred until the court has ruled on the motion to dismiss.

by the limited partners would be used to finance the acquisition of oil and gas company leases and royalties therein, and for the acquisition of acreage on which the Program would test for and ultimately drill and develop oil wells. The prospectus stated further that Prudent would not charge the Program for indirect costs or administrative expenses and that each limited partner would have an undivided interest in the Program's properties proportionate to the capital investments made. It also contained assurances that the Program would not buy property from the trustees, officers, or employees of Prudent; that if Prudent sold property to the Program it would sell only "oil and gas" leases or producing properties and that it would not profit on the transaction, receiving in return only its cost plus reimbursement for direct expenses; and that Prudent was obligated to deal fairly and in good faith with its limited partners and all investment decisions would be made consistent with these duties, rather than with Prudent's self-interest.[2] Relying on the representations in the prospectus, Fox bought ten limited partnership units at a price of $5,000 per unit for a total investment of $50,000. Altogether, as a result of the public offering, 636 limited partnership units were sold by the Program and Prudent to 150 individuals for a total of $3,180,000.

The complaint further alleges that, despite the terms of the prospectus, even while the offer to the public remained outstanding, Prudent and the other defendants embarked upon a course of self-dealing which operated as a fraud on the prospective limited partners. Plaintiff also alleges that Prudent profited handsomely from the sale of properties to the Program, despite the prohibition against

this in the prospectus; that Prudent also charged indirect costs and administrative expenses to the Program; that Prudent knowingly purchased properties from officers, trustees and employees of the Program, blatant acts of self-dealing in flat contravention of the guarantees of the prospectus; that this course of conduct which began in April 1969 continued until well into 1972, and resulted in the enrichment of the general partner and certain named individuals, and the simultaneous attrition in worth of the investment of plaintiff and the other limited partners; and that the defendants concealed their actions from the limited partners by means of a series of misleading communications describing the Program's investments.

In offering their 12(b) motion to dismiss, Prudent and the individual defendants contend that the actions complained of, even if true, do not constitute violations of Rule 10b-5 or § 17(a) of the 1933 Act; that Prudent is neither an investment company nor advisor under the provisions of the Investment Company or Investment Advisors Acts and that, barring these bases of federal jurisdiction, this action should be consigned to state court because there is no diversity of citizenship between the parties on which to premise federal jurisdiction, 28 U.S.C. § 1332. Movants also argue that while the complaint alleges fraud, the allegations of fraud have not been set forth with the particularity required by F.R.C.P. 9(b). These contentions will be considered *seriatim*.

I. *10b–5 Claims.*

The gravamen of the complaint is that Prudent's conduct has violated SEC Rule 10b–5,[3] a provision which in the past ten years has risen "from obscurity to the

---

2. Fox places great emphasis on the presence of this last statement in the prospectus. However, it seems clear to the court that the case would not be altered in its absence. Prudent's fiduciary responsibility derives from the relationship between the parties rather than from any written assurances it offered.

3. Rule 10b–5 (17 C.F.R. 240.10b–5) provides:
"It shall be unlawful for any person, directly or indirectly, by the use of any means

or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
(a) To employ any device, scheme, or artifice to defraud,
(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made in the light of the circumstances under which they were made, not misleading, or

highest place in policing 'securities fraud.'" 1 Bromberg, Securities Law: Fraud, Sec. 1.1, p. 5 (1973). The linchpin of a 10b–5 violation is fraud "in connection with the purchase or sale" of a security, and Fox has stated two claims under 10b–5: one arising from fraud alleged "in connection with" Fox' purchase of his limited partnership units; the other arising from fraud alleged "in connection with" the purchase of various securities by the Program, presumably on behalf of all the partners. Because, as will become evident, the two 10b–5 claims are not co-extensive, they will be analyzed separately.

A. *Purchase of Limited Partnership Units by Fox.*

In this claim, Fox alleges that he purchased his limited partnership units in the Program as a result of misrepresentations in the prospectus through which the public offering was made. Read liberally, the complaint alleges that defendants had already begun to engage in transactions which constituted self-dealing while the prospectus was still being considered by the public. At the very least, the complaint alleges that defendants' plan to enrich themselves at the expense of the enterprise was already formulated at the time the partnership units were being offered to the public through the prospectus.

 In my view, these facts, if proven, would constitute a 10b–5 violation. It is alleged that defendants, for the purpose of inducing investors to purchase shares in their business, intentionally misrepresented material facts concerning the way the Program would be operated. Whereas the prospectus pictured the embryonic enterprise as being run for the benefit of all investors, and made guarantees to that effect, plaintiff charges that actually plans were afoot to run it as a vehicle to enrich a privileged few "inside" investors at the expense of the limited partners. A misleading prospectus can play a part in a scheme which violates Rule 10b–5, see, e. g., Green v. Wolf Corp., 406 F.2d 291 (2d Cir. 1968), whenever the misrepresentation is "of a sort that would cause reasonable investors to rely thereon, and, in connection therewith, so relying, cause them to purchase or sell a corporation's securities." Gottlieb v. Sandia American Corp., 452 F.2d 510, 516 (3d Cir. 1971), quoting SEC v. Texas Gulf Sulphur Co., 401 F.2d 833, 860 (2d Cir. 1968). The assurances in the prospectus that the Program would not purchase property from its trustees or employees would be "material," List v. Fashion Park, Inc., 340 F.2d 457, 462 (2d Cir. 1965), to an investor of any experience, because the liquid and readily negotiable nature of the assets of investment trust companies have traditionally "offered many opportunities for exploitation by unscrupulous management." L. Loss, Securities Regulation, vol. 1, p. 146 (2 ed. 1961). The basic purpose of 10b–5—to safeguard investors by policing devices inimical to "the climate of fair dealing"—dictates the conclusion that these allegations state a claim under Rule 10b–5.

Defendants' argument that no 10b–5 claim is stated relies almost exclusively on Lester v. Preco Industries, Inc., 282 F.Supp. 459 (S.D.N.Y.1965). In that case, the court considered the question "whether allegations of evil intent, purportedly entertained when the registration statement was filed but not carried out until a subsequent time, are sufficient to convert what would otherwise be a stockholders derivative suit into a suit for violation of the 1934 Act." 282 F. Supp. at 462. In concluding that a federal claim was not stated, the court stated:

"If such a complaint sets forth a cause of action under the Security Laws, by merely adding the allegation that defendants intended so to spend money at the time of a registration statement, any stockholders of any cor-

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

in connection with the purchase or sale of any security."

poration who are unhappy about any expenditure of corporate funds can obtain federal jurisdiction over their complaint by merely alleging that any given expenditure was not fully disclosed in the last registration statement on file for that company." 282 F.Supp. at 464. (On Motion to Reargue)

■ The *Lester* ruling is not persuasive in this case. *Lester* reflects a judicial view of 10b–5 which has since been discredited. The court was strongly influenced by Birnbaum v. Newport Steel Corp., 193 F.2d 461 (2d Cir.), cert. denied, 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952), and what has been described as Birnbaum's "extraordinary restraint" that 10b–5 is not aimed at "'fraudulent mismanagement of corporate affairs.'" Bromberg, *supra,* at 84.15. But "little of the *Birnbaum* rationale—of excluding fiduciary breach from the scope of 10b–5—survived the decisions of the 1960's. . . ." Bromberg, *supra,* at 84.18. Rule 10b–5 projects into the realm of more general corporate management to reach *"all* fraudulent schemes in connection with the purchase or sale of securities, whether . . a garden type variety of fraud, or . . a unique form of deception." A. T. Brod & Co. v. Perlow, 375 F.2d 393, 397 (2d Cir. 1967). Where 10b–5 properly extends, it will be applied regardless of any cause of action that may exist under state law. Popkin v. Bishop, 464 F.2d 714 (2d Cir. 1972); *cf.* Superintendent of Insurance v. Banker's Life and Casualty Co., 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed. 2d 128 (1971). To deny that plaintiffs have stated a cause of action under Rule 10b–5, defendants must take the position that they may concoct a plan to defraud investors, issue a prospectus to attract investment to that plan and thereafter carry out their fraudulent scheme and yet avoid 10b–5 liability so long as they waited until the public offer was complete before breaching the promises made in the prospectus. So stated, this view of Rule 10b–5 falls of its own weight.

Of course, plaintiff has the heavy burden of showing either that transactions which were in violation of the prospectus occurred while the prospectus was before the public, or if self-dealing took place only after the public offering was complete, that defendants intended to defraud their purchasers at the time they issued the prospectus, but problems of proof concerning the merits of the case cannot effect the result at this point. Fox' allegations of fraud in connection with the purchase of his share in the limited partnership state a claim under 10b–5 satisfying federal jurisdiction.

B. *The Purchase of Securities by the Program.*

Fox also alleges that 10b–5 was violated because of defendants' fraud and misrepresentation "in connection with" the securities purchased and sold by the Program between 1969 and 1972. Presumably, this claim is concerned with the purchase and sales made by the Program from trustees or officers of the Program, purchases which constituted self-dealing and breaches of fiduciary duty and which caused the attrition of Fox' investment.

■ At first blush, this second 10b–5 count appears to be superfluous. The fraudulent activities allegedly committed by defendants are identical to those outlined in the first 10b–5 claim; only the "purchase or sale" on which the claim hinges differs. Further reflection, however, confirms the need for this second count from Fox' standpoint. Ultimate success on the merits of the first count requires proof of either fraudulent transactions or fraudulent intent contemporaneous with the release of the prospectus. If Fox cannot sustain this burden of proof, or if it becomes evident that defendants realized the possibilities for self-enrichment only after the sale of the limited partnership shares was complete, a 10b–5 action premised on Fox' original purchase of shares as a result of the prospectus could not be sustained. In such case, Fox seeks to insure that grounds for a 10b–5 action will exist

even for late blossoming fraud by focusing on the "purchase or sale" of securities by the partnership. In this regard, he can achieve only partial success. The thrust of this claim is directed at the purchase and sale of securities by the Program, rather than at purchase of the interest in Program by Fox. He seeks to recover only as the indirect victim of a fraudulent scheme. However, the so-called "purchaser-seller" rule, coined in *Birnbaum, supra,* which holds that 10b–5 protects only defrauded purchasers or sellers of securities, retains vitality in this circuit with respect to a private action for damages.[4]

In Landy v. FDIC, 486 F.2d 139 (3d Cir. 1973), cert. denied, 416 U.S. 960, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974), shareholders of a bank brought a 10b–5 action to recover damages for losses resulting from the fraudulent use of bank funds and sale of the bank's securities by the bank's president. Although $200 million worth of securities were involved and the damage suffered by plaintiff shareholders was *arguendo* clear, the court refused to permit an action for damages, stating:

"When Congress enacted section 10(b), it did not contemplate the protection of every person injured by a fraudulent scheme in connection with the purchase or sale of securities . . . . [Plaintiffs here] did not engage in any market transaction with the defendants by which they sustained their losses. Were we to extend the provisions of section 10(b) beyond the buyer or seller relationship . . . [it] would establish a new and amorphous body of rights and obligations heretofore unrecognized in federal jurisdiction." 486 F.2d at 157–158.

Because the second 10b–5 claim in the instant case, as in *Landy,* is presented by an investor who was only indirectly victimized by securities fraud, *Landy* controls and no claim for damages is stated in connection with purchases of securities made by the Program.

Fox' claim for injunctive relief stands on a different footing. "It is not necessary in a suit for equitable or prophylactic relief to establish all the elements required in a suit for monetary damages." SEC v. Capital Gains Research Bureau, Inc., 375 U.S. 180, 193, 84 S.Ct.

---

4. The erosion of the "purchaser-seller" rule has been pronounced. See, e. g., Lowenfels, The Demise of the Birnbaum Doctrine: A New Era for Rule 10b–5, 54 Va.L.Rev. 268 (1968).

Section 10(b) and Rule 10b–5 is "remedial legislation [which] should be construed broadly to effectuate its purposes." Tcherepnin v. Knight, 389 U.S. 332, 336, 88 S.Ct. 548, 553, 19 L.Ed.2d 564 (1967). Rule 10b–5 was intended as a "catchall" provision, Herpich v. Wallace, 430 F.2d 792, 802 (5th Cir. 1970), designed to encompass those myriad devices antithetic to the "climate of fair dealing," SEC v. Capital Gains Research Bureau, Inc., 375 U.S. 180, 201, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963). Given the broad purposes of the rule, many courts, quite understandably, have chafed at the strictures of a rigid purchaser-seller rule. This unhappiness has led to repeated enlargement of the traditional notion of who was a purchaser or seller, while retaining the basic Birnbaum rule. See, e. g., SEC v. Nat'l Securities, Inc., 393 U.S. 453, 89 S.Ct. 564, 21 L.Ed.2d 668 (1969) (merger is purchase or sale by corporate entity, or by shareholder, permitting class or deriva- tive actions or both); Dudley v. Southeastern Factor and Finance Corp., 446 F.2d 303 (5th Cir. 1971), cert. denied, 404 U.S. 858, 92 S.Ct. 109, 30 L.Ed.2d 101 (1971) (when corporation liquidates, shareholders giving up securities for assets are "sellers"); Vine v. Beneficial Finance Co., 374 F.2d 627 (2d Cir. 1967) (transaction altering the status of a shareholder without his consent may be forced sale or forced purchase under 10b–5); Hooper v. Mountain States Securities Corp., 282 F.2d 195 (5th Cir. 1960), reh. denied, Sept. 26, 1960, cert. denied, 365 U.S. 814, 81 S.Ct. 695, 5 L.Ed.2d 693 (1961) (company issuance of its own shares is a sale for 10b–5 purposes). These modifications are summarized more fully in Bromberg, supra, 88.2–88.6.

The Seventh Circuit recently became the first to discard the Birnbaum rule with respect to a damage action, holding that shareholders who neither purchased nor sold but nonetheless suffered losses in the value of their securities are investors entitled to the protections of Rule 10b–5. Eason v. General Motors Acceptance Corp., 490 F.2d 654 (7th Cir. 1973), cert. denied, 416 U.S. 960, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974).

275, 283, 11 L.Ed.2d 237 (1963). In Kahan v. Rosenstiel, 424 F.2d 161 (3d Cir.), cert. denied, 398 U.S. 950, 90 S.Ct. 1870, 26 L.Ed.2d 290 (1970), the Third Circuit carefully examined the policy underlying Rule 10b–5 and charted the development of the Rule in other courts, particularly the Second Circuit,[5] before concluding that standing under Rule 10b–5 for the purpose of seeking injunctive relief is not limited to purchasers or sellers "if a plaintiff can establish a causal connection between the violations alleged and [his] loss." 424 F.2d at 173. As the Second Circuit observed, "the claim for injunctive relief . . . may cure harm suffered by continuing stockholders, and would afford complete relief against the Rule 10b–5 violation in the future," Mutual Shares Corp. v. Genesco, Inc., 384 F.2d 540, 547 (2d Cir. 1967), without raising remoteness of interest problems which arise if the purchaser-seller requirement in damage suits is deleted. The court in Kahan went on to state:

> "The Act was designed to eliminate deceptive and unfair practices in security trading and to protect the public from inaccurate, incomplete and misleading information . . . . A suit which seeks to enjoin deceptive practices which if continued would lead to completed purchases or sales that give rise to a cause of action under § 10(b) is not inconsistent with this policy and will in fact promote free and open public securities markets." 424 F.2d at 173.

■■ Under *Kahan*, then, it is possible for Fox to state a claim for injunctive relief under 10b–5 although he is not a "purchaser or seller" of securities, if the conduct alleged would constitute a violation of Rule 10b–5. This is such a case. When directors or key officers of a corporation exploit their positions for personal gain by selling property[6] to the corporation at inflated prices or issuing stock to themselves for inadequate consideration, 10b–5 is violated. In effect, the corporation is the defrauded purchaser or seller, and a derivative suit brought on behalf of the corporation would properly lie, e. g., Pappas v. Moss, 393 F.2d 865 (3d Cir. 1968); Kane v. Central American Mining & Oil, Inc., 235 F.Supp. 559 (S.D.N.Y.1964). Fox will have the responsibility of showing, as *Kahan* requires, the "causal connection between the violations . . . and [his] loss," but if he is able to show that link and prove the substance of his complaint, the court could enjoin the Program from further transactions which constitute self-dealing or otherwise violating defendants' obligation of fiduciary duty to the limited partners of the Program. There is no substance to the claim made by defendants at oral argument that *Landy* somehow undercut or overruled *Kahan*. Judge Rosenn's exhaustive opinion in *Landy* clearly reaffirms the holding in *Kahan* and sharply distinguishes a suit for injunctive relief from suits for damages. 486 F.2d at 156.

Fox attempts to bring his second 10b–5 claim within the ambit of *Landy* by arguing that he and those similarly situated were actually "purchasers" and "sellers" each time the Program bought or sold securities. In support of this proposition, he cites James v. Gerber Products Co., 483 F.2d 944 (6th Cir. 1973), in which the court concluded that the beneficiary of a testamentary trust was a "de facto seller" for 10b–5 pur-

---

5. See, e. g., Iroquois Industries Inc. v. Syracuse China Corp., 417 F.2d 963 (2d Cir. 1969), cert. denied, 399 U.S. 909, 90 S.Ct. 2199, 26 L.Ed.2d 561 (1970); Crane Co. v. Westinghouse Air Brake Co., 419 F.2d 787 (2d Cir. 1969), cert. denied, 400 U.S. 822, 91 S.Ct. 41, 27 L.Ed.2d 50 (1970); Butler Aviation Internat'l Inc. v. Comprehensive Designers, Inc., 307 F.Supp. 910 (S.D.N.Y.

1969), aff'd, 425 F.2d 842 (2d Cir. 1970), which are discussed by Judge Adams in Kahan, supra, 424 F.2d at 171–172.

6. Of course, the property involved would have to be a "security" as broadly defined in 15 U.S.C. § 78c(a)(10). In this case, plaintiff Fox has so pleaded.

poses when the trustees fraudulently sold securities from the trust, since the beneficiary "was the person who was to be benefitted by the sale . . . ." 483 F.2d at 948. In my view, the analogy between Fox' position and that of James is unconvincing. The Program is a limited partnership, shares of which were offered to the public and are now held by 150 people. It is true that Fox, as a limited partner in the Program, is ultimately a "beneficiary" of the transactions undertaken by Prudent for the Program. However, in that regard, his situation is no different from that of a shareholder in a corporation, who, in a sense, owns a *pro rata* share of the corporation's assets and is therefore a "beneficiary" of all transactions undertaken by management. The analogy of the Program to a corporation is far more obvious than its analogy to a testamentary trust.[7] But once this analogy is accepted, it becomes evident that deeming Fox a "purchaser" or "seller" for 10b–5 purposes would require the same result in the case of a corporate shareholder who claims to be a purchaser or seller because of sales by the management. Quite obviously, such a result would be completely inconsistent with *Landy*, and accordingly it is rejected.

7. See, e. g., Morrissey v. Commissioner, 296 U.S. 344, 356–357, 56 S.Ct. 289, 80 L.Ed. 263 (1935), and section V of this Opinion, *infra*, in which similar questions are discussed for purposes of determining whether there is diversity of citizenship between the parties.

8. Compare, e. g., Dorfman v. First Boston Corp., 336 F.Supp. 1089, 1093–1095 (E.D. Pa.1972) (upholding an implied private right of action under § 17(a).) with Dyer v. Eastern Trust & Banking Co., 336 F.Supp. 890, 903–905 (N.D.Me.1971) (denying it); see also SEC v. Texas Gulf Sulphur Co., 401 F.2d 833, 867 (2d Cir. 1968), cert. denied, 404 U.S. 1005, 92 S.Ct. 562, 30 L.Ed.2d 558 reh. denied, 404 U.S. 1064, 92 S.Ct. 733, 30 L.Ed.2d 753 (1971) (concurring opinion of Friendly) which sets forth the reasons, grounded in legislative history and the elaborate scheme of remedies in the 1933 Act, for

## II. *Section 17(a) of the 1933 Act.*

Fox has also alleged violations of § 17(a) of the 1933 Act, 15 U.S.C. § 77q(a), the provisions of which are identical to those of Rule 10b–5. While the interesting question as to whether § 17 (a) gives rise to an implied civil remedy for damages is still open,[8] it is unnecessary here to express an opinion on this issue. The § 17(a) claim is directed at precisely the same conduct as the 10b–5 claim. Federal jurisdiction exists by virtue of the 10b–5 claim; any monetary or injunctive relief which the court could ultimately grant pursuant to § 17(a) can be granted under 10b–5. As a practical matter, the § 17(a) claim is redundant in this case, and no further discussion of it is necessary. Accord, Herpich v. Wallace, 430 F.2d at 799, n. 6; Globus v. Law Research Service, Inc., 418 F.2d 1276, 1283 (2d Cir. 1969).

## III. *Investment Company Act and Investment Advisors Act.*

Plaintiff next attempts to state a cause of action under the Investment Company Act and the Investment Advisors Act, 15 U.S.C. § 80a–1 et seq. (1940), claiming that Prudent satisfies the statutory definition of an investment company [9] and/or

denying a private right of action, but concludes that once a private right of action is held to exist under 10b–5 there is no reason to deny it under § 17(a) as long as fraud, rather than negligent misrepresentation is involved.

9. The Act defines an "investment company" as "any issuer which—
(1) is or holds itself out as being engaged primarily, or proposes to engage primarily, in the business of investing, reinvesting, or trading in securities; [or] . . .
(3) is engaged or proposes to engage in the business of investing, reinvesting, owning, holding, or trading in securities, and owns or proposes to acquire investment securities having a value exceeding 40 per centum of the value of such issuer's total assets (exclusive of Government securities and cash items) on an unconsolidated basis." 15 U.S.C. § 80a–3(a)(1) and (3).

an investment advisor.[10] As such, Fox argues, the pattern of self-dealing and fraud that was alleged to violate Rule 10b–5 would also constitute violations of § 80a–35, dealing with breach of fiduciary duty by an investment company, and § 80b–6, which prohibits investment advisors from using the mails or instrumentalities of interstate commerce "to employ any device, scheme, or artifice to defraud any client . . ." Additionally, if Prudent is an Investment Company or an Investment Advisor it would be liable for failing to register as an investment company, § 80a–7, or as an investment advisor, § 80b–3; failing to file reports required by the SEC, § 80a–8; § 80b–4; and failing to file certain papers with the Commission required in the event of involvement in a lawsuit, § 80a–32.

■ The courts have been inclined to conclude that the Investment Company Act should be construed so as to permit an implied civil remedy, enabling private parties to supplement the SEC's enforcement efforts by seeking rescission of contracts entered into with unregistered companies. See, e. g., Esplin v. Hirschi, 402 F.2d 94 (10th Cir. 1968), cert. denied, 394 U.S. 928, 89 S.Ct. 1194, 22 L.Ed.2d 459 (1969); Greater Iowa Corp. v. McLendon, 378 F.2d 783 (8th Cir. 1967).

In response to plaintiff's allegations, Prudent argues generally that it is neither an Investment Company nor an Investment Advisor. More specifically, it argues, on the basis of an affidavit by Abraham Sanders, that it has not "held itself out" as a company investing or trading in securities, making the definition of an investment company of § 80a–3(e)(1) inapplicable; and that it cannot be deemed an "advisor" for the Program, because it was really 25% holder of the Program's "shares" and making investments very much on its own behalf when it invested for the Program. Even if it was an "advisor," Prudent argues, the Program was its only client, entitling it to an exemption under § 80b–3(b)(3), which exempts from the Act any investment advisors who during the course of the preceding twelve months has had fewer than fifteen clients and who neither holds itself out generally to the public as an investment advisor nor acts as an investment advisor.

■ It does appear unlikely that Prudent was either an investment company or an investment advisor within the meaning of the statutes. However, out of an abundance of caution, I will not dismiss this claim at this juncture. Despite the Sanders affidavit, which is not controverted by plaintiff, the record is not developed sufficiently to enable me to ascertain with confidence the nature of Prudent's business. Moreover, although Sanders has stated that Prudent has not "held itself out" as an invest-

10. " 'Investment adviser' means any person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities, or who, for compensation and as part of a regular business, issues or promulgates analyses or reports concerning securities; but does not include (A) a bank, or any bank holding company as defined in the Bank Holding Company Act of 1956 which is not an investment company; (B) any lawyer, accountant, engineer, or teacher whose performance of such services is solely incidental to the practice of his profession; (C) any broker or dealer whose performance of such services is solely incidental to the conduct of his business as a broker or dealer and who receives no special compensation there-for; (D) the publisher of any bona fide newspaper, news magazine or business or financial publication of general and regular circulation; (E) any person whose advice, analyses, or reports relate to no securities other than securities which are direct obligations of or obligations guaranteed as to principal or interest by the United States, or securities issued or guaranteed by corporations in which the United States has a direct or indirect interest which shall have been designated by the Secretary of the Treasury, pursuant to section 78c(a)(12) of this title, as exempted securities for the purposes of the Securities Exchange Act of 1934; or (F) such other persons not within the intent of this paragraph, as the Commission may designate by rules and regulations or order." 15 U.S.C. § 80b–2(a)(11).

ment company, it is possible that statements were made in the prospectus which could have struck a reasonable investor in a way unintended by Prudent. Without having the prospectus as part of the record, I am reluctant to foreclose that possibility. I will therefore deny the motion to dismiss this claim now, with full anticipation that it may later fall out of the case.

### IV. *Jurisdiction Over State Claims.*

In addition to the federal claims set forth in his complaint, Fox also alleges several violations of state law. In the third cause of action, he makes what appears to be the charge of breach of fiduciary duty and mismanagement under state law. In the fifth cause of action, Fox alleges that Prudent breached its fiduciary duty and a contractual obligation to register and distribute 636,000 shares of Prudent stock which were given to Prudent by I. Theodore Leader to hold as trustee solely for the limited partners. The threshold issue posed by these state claims is whether this court has jurisdiction over them. Plaintiff asserts that the court has jurisdiction, either because the jurisdictional prerequisites of 28 U.S.C. § 1332, diversity of citizenship and $10,000 in controversy, have been satisfied, or by virtue of the doctrine of pendent jurisdiction.

Looking first at the question of diversity: it is undisputed that plaintiff is a Pennsylvania citizen and that all the defendants other than Prudent Resources Trust are New York citizens. The dispute, upon which the question of complete diversity depends, is whether Prudent should be treated as a New York citizen for diversity purposes. Plaintiff contends that Prudent, although a business trust, should be treated like a corporation for diversity purposes and deemed to be a citizen of the state where it is organized, New York. Defendants, on the other hand, contend that Prudent, as an unincorporated association, is a citizen of every state in which its "members" reside, including Pennsylvania, which would defeat diversity jurisdic-

tion. Plaintiff relies on Mason v. American Express Co., 334 F.2d 392 (2d Cir. 1964) in support of his position that Prudent should be treated like a corporation for diversity purposes. In a thoughtful and scholarly opinion by Judge Waterman, the court held that an unincorporated joint stock association was a separate "juridical" entity which for diversity of citizenship purposes should be considered a "citizen" of the state where it was organized. The court emphasized the many resemblances between the joint stock association and a corporation which justified treating it as a "cohesive entity, not a mere aggregation of individuals." 334 F.2d at 402. The court in *Mason* also voiced its concern that "the size of this association's operations and the number of its shareholders [made] it not unlikely that it has shareholders in all fifty states in the union, and if so, a refusal to treat it as a legal entity would entirely foreclose access by it, as either plaintiff or defendant, to the federal courts in diversity cases." 334 F.2d at 402. The reasoning of the *Mason* opinion is impressive, particularly in light of the very strong resemblance between Prudent Resources Trust and a corporation. As of November 1972, Prudent had more than 3.3 million shares of outstanding stock, and its shares were publicly traded on the American Stock Exchange. (Affidavit of BGL Oil Co., Document 17). The managerial structure of Prudent, like that of most business trusts, is very similar to that of a corporation. See Morrissey v. Commissioner, 296 U.S. 344, 355–357, 56 S.Ct. 289, 80 L.Ed. 263 (1935) (holding that a business trust should be taxed in the same way as a corporation because of their similarities). Nevertheless, language in the Supreme Court's decision in United Steelworkers v. R. H. Bouligny, Inc., 382 U.S. 145, 86 S.Ct. 272, 15 L.Ed.2d 217 (1965) convinces me that I am not free to embrace the *Mason* approach. In that case the court held that an unincorporated labor union is not a "citizen" for the purposes of diversity jurisdiction, its

citizenship being instead that of each of its members. More important for this case, the Supreme Court recognized the appeal of ascertaining whether unincorporated associations had distinct "juridical personalities" but concluded that appeals to widen diversity jurisdiction were properly directed at Congress, rather than at the courts. Title 28 U.S.C. § 1332(c) specifically deals with the problem of corporations for diversity purposes; for unincorporated associations to be deemed citizens of a single state, a similar statutory provision would be required. On the basis of *Bouligny*, I conclude that Prudent Resources Trust is not a citizen of New York, and that this court does not have diversity jurisdiction over Fox' state claims.

In the absence of complete diversity of citizenship between plaintiff and all defendants, this court's jurisdiction over plaintiff's state claim depends on whether I can and should exercise pendent jurisdiction over the claims. Under the now familiar test enunciated in United Mine Workers of America v. Gibbs, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed. 2d 218 (1966), "Pendent jurisdiction . . . exists whenever there is a [federal] claim . . . and the relationship between that claim and the state claim permits the conclusion that the entire action before the court comprises but one constitutional 'case.' . . . The state and federal claims must derive from a common nucleus of operative fact." *Gibbs* also establishes that "[t]hat power need not be exercised in every case in which it is found to exist. It has consistently been recognized that pendent jurisdiction is a doctrine of discretion, not of plaintiff's right. Its justification lies in considerations of judicial economy, convenience and fairness to litigants; if these are not present a federal court should hesitate to exercise jurisdiction over state claims . . . ." 383 U.S. at 726, 86 S.Ct. at 1139.

 With these criteria in mind, pendent jurisdiction will be exercised over the state claims which comprise the

third cause. The pattern of fiduciary breach, self-dealing and fraud in violation of the promises of the prospectus is the same as the conduct attacked as violative of Rule 10b–5. Plainly, "the state and federal claims derive from a common nucleus of operative fact." United Mine Workers of America v. Gibbs, 383 U.S. at 725, 86 S.Ct. at 1138. Judicial economy and fairness to litigants would not be furthered by requiring the parties to engage in duplicative litigation in state court, once this suit has been entertained by the federal court. There is no strong countervailing policy reason justifying a refusal to exercise pendent jurisdiction; federal claims predominate in this suit, and the question of state law raised by the alleged breach of fiduciary duty is not the unique type which should be considered by the state courts in the first instance. See United Mine Workers of America v. Gibbs, 383 U.S. at 726, 86 S.Ct. 1130.

Whether pendent jurisdiction should be exercised over Fox' other state claim is a closer question. Prudent's alleged breach of fiduciary duty and contractual obligations arising out of its failure to distribute the stock given by I. Theodore Leader to Prudent for the limited partners violates no federal securities law. The absence of a "purchase or sale" of securities renders Rule 10b–5 inapplicable; similarly, as long as the securities were "given" by Leader, rather than sold, § 5 of the 1933 Act, 15 U.S.C. § 77e, imposes no obligation to register the stock. The claim is strictly premised on a violation of state law, and does not entail a duplication of the same facts which underlie a federal claim.

Nevertheless, although the *Gibbs* opinion is best known for its phrase "common nucleus of operative fact," it would disserve the Supreme Court's opinion to apply that phrase unthinkingly in evaluating the soundness of a request for the exercise of pendent jurisdiction. For the Court also stated in Gibbs:

"But if, considered without regard to their federal or state character, a plaintiff's claims are such that he

would ordinarily be expected to try them all in one judicial proceeding, then, assuming substantiality of the federal issues, there is *power* in federal courts to hear the whole." United Mine Workers of America v. Gibbs, 383 U.S. at 725, 86 S.Ct. at 1138.

■ Given the policies which the Supreme Court's *Gibbs* decision sought to further, I believe pendent jurisdiction should be exercised over the state claim arising out of Leader's "gift" to the Program's limited partners. Concededly, the precise facts involved do not form the basis of a federal claim. However, the parties involved are identical to those in the federal claims, the sequence of events is closely related chronologically, and the behavior alleged is another act of breach of fiduciary duty by the general partner which is at the root of plaintiff's action. If the issues of state law thus presented were novel, there would be a greater reluctance to adjudicate the issue, but it appears to be a relatively straightforward one alleging breach of contract and breach of fiduciary duty. Here too, judicial economy and fairness to the litigant would be ill-served by requiring the parties to resort to state court to try this single issue.

### V. *The Adequacy of the Complaint.*

Finally, defendants offer the overall objection that Fox has failed to set forth allegations of securities fraud with the requisite particularity. On this basis, defendant requests that the complaint be dismissed, pursuant to F.R.C.P. 12(b), or alternatively, that Fox be required to make a more definite statement of his claims. F.R.C.P. 12(e).

At issue between the parties is the applicability and effect of Federal Rule 9(b) which provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity . . . ." In support of the sufficiency of his complaint, plaintiff has argued that Rule 9(b) governs the pleading of common law fraud but is not applicable to actions grounded on the federal securities law. Defendant has taken the position that a complaint based on the federal securities law must nevertheless comply with Rule 9(b) and that plaintiff has not done so.

■ While there is respectable authority supporting plaintiff's position, Ellis v. Carter, 291 F.2d 270, 275 n. 5 (9th Cir. 1961); Stevens v. Vowell, 343 F.2d 374, 379 n. 3 (10th Cir. 1965); *cf.* Lorenz v. Watson, 258 F.Supp. 724, 731 (E.D.Pa.1966) (quoting *Ellis, supra,* with approval) most courts which have recently considered the question have concluded that the requirements of F.R.C.P. 9(b) must be satisfied in a complaint alleging securities fraud. See, e. g., Shemtob v. Shearson, Hammill & Co., 448 F.2d 442 (2d Cir. 1971); Kellman v. ICS, Inc., 447 F.2d 1305 (6th Cir. 1971); Dudley v. Southeastern Factor & Finance Corp., 446 F.2d 303 (5th Cir.), cert. denied, 404 U.S. 858, 92 S.Ct. 109, 30 L.Ed.2d 101 (1971); Bowman v. Hartig, 334 F.Supp. 1323 (S.D.N.Y. 1971); Trussell v. United Underwriters Ltd., 228 F.Supp. 757 (D.Col.1964). In the absence of a Third Circuit case on point, I am persuaded by the majority of the courts considering the question that the adequacy of plaintiff's complaint should be judged against the standard of Rule 9(b). However, "[t]he requirement of particularity does not abrogate Rule 8, and it should be harmonized with the general directives in subdivisions (a) and (e) of Rule 8 that the pleadings should contain 'a short and plain statement of the claim or defense,' and that each averment should be 'simple, concise and direct.' Rule 9(b) does not require nor make legitimate the pleading of detailed evidentiary matter." 2A Moore's Federal Practice ¶ 9.03, pp. 1929–1930 (2 ed. 1972). Additionally, where plaintiff seeks to state a claim under the securities law, it is obviously the elements of fraud which constitute a violation of the securities laws, rather than the elements of common law fraud, which must be pleaded with particularity.

■ Judged against this standard, plaintiff's complaint, while hardly a

model of clarity, fairly apprises the defendants of the transactions complained of and does so with the requisite particularity. In alleging violations of the Rule 10b–5 stemming from the misleading prospectus, plaintiff summarized the representations made in the prospectus, noting specifically, inter alia, the statements that Prudent would not charge for indirect costs or administrative expenses of running the Program; that Prudent was obligated to deal fairly and in good faith with the partnership; that Prudent could sell to the Program only "oil and gas leases" or "producing properties" and was limited to receiving cost plus reimbursement for direct expenses; and that no property would be purchased from any trustees, officers or employees. (Complaint at 4a, b) Plaintiff then alleged that he relied on the representations in the prospectus in purchasing his securities and the prospectus was materially misleading and false, because Prudent sold properties to the Program other than those permitted; charged the Program for indirect costs and administrative expenses and knowingly purchased property from officers, trustees and employees of Prudent. (Complaint at 5). In setting forth the specific misrepresentations in the complaint and his reliance upon them, plaintiff has satisfied his pleading burden under Rule 9 (b). To require that he itemize specifically the transactions by the defendants which constitute self-dealing would impose an insuperable burden at this state of the litigation. Rule 9(b) "may be relaxed somewhat as to matters peculiarly within the adverse party's knowledge," 2A Moore's Federal Practice ¶ 9.03, supra, at 1928, in recognition of the fact that such information can often be uncovered only through discovery.

A review of the other cases in which a securities fraud complaint was tested against the standard of Rule 9(b) supports the conclusion that this complaint was adequate. In Dudley v. Southeast-

ern Factor & Finance Corp., *supra*, the complaint was upheld as a sufficiently particular allegation of fraud, although in substance it alleged only that defendant Atlantic knew or should have known of the existence of issued and outstanding preferred stock held by IITC and First American, and that despite that knowledge, Atlantic distributed all the stock directly to creditors and common shareholders, ignoring the preferred position of IITC and First American. Even considering the allegations that the distribution constituted fraud and deceit, that complaint was no more "particular" than the instant one. In Kellman v. ICS, Inc., *supra*, the court held that the requirements of Rule 9(b) were not satisfied, but based its decision on the failure of the plaintiffs to "state what portions of the letter or prospectus are false or constitute 'half-truths' nor have they ever stated how they were defrauded in any specific respects," 447 F.2d at 1309, making that case distinguishable from the instant situation. Shemtob v. Shearson, *supra*, posed a slightly different problem. In that case, the court found that the relevant facts were stated with sufficient particularity, but taken together they constituted "nothing more than a garden-variety customer's suit against a broker for breach of contract, which [could not] be bootstrapped into an alleged violation of § 10(b) of the Exchange Act, or Rule 10b–5, in the absence of allegation of facts amounting to *scienter*, [or] intent to defraud . . . " 448 F.2d at 445. Because the facts alleged portrayed nothing more than a breach of contract, plaintiff could not bridge the gap and satisfy Rule 9(b) by means of a conclusory allegation that the broker's decision to sell was fraudulent. In contrast, in the instant case, the allegations, if accepted, support a conclusion of fraud.[11]

The other counts of the complaint are similarly adequate to meet the requirements of Rule 9(b), particularly since

11. I agree with defendants that Bowman v. Hartig, supra, generally supports their position, but I believe that case represents an overly stringent reading of Rule 9(b) and I decline to follow it.

they incorporate by reference all the factual allegations of the first count. The allegations relating to the Investment Company Act are identical to allegations under Rule 10b–5, with the additional allegation that Prudent was an investment company or an investment advisor. Similarly, the state claim of breach of fiduciary duty is premised on the same conduct alleged in count I. Plaintiff's second cause based on Rule 10b–5 is the weakest link in the complaint, but as noted above, the specific details supporting the misdeeds alleged can only be developed through discovery. Tested by a motion to dismiss, the complaint is adequate to put defendants on notice of charges against them.